## ROBERT KING, SR. *v.* STATE OF MARYLAND

[No. 135, September Term, 1968.]

654

*Decided January 20, 1969.*

The cause was argued before Murphy, C.J., and Anderson, Morton, Orth, and Thompson, JJ.

*Sidney S. Campen* for appellant.

*Henry J. Frankel, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *William B. Yates, II, State's Attorney for Dorchester County,* on the brief, for appellee.

Orth, J., delivered the majority opinion of the Court. Anderson and Thompson, JJ., dissent. Dissenting opinion by Thompson, J., in which Anderson, J., concurs, at page 674 *infra.*

The appellant was found guilty by a jury in the Circuit Court

for Dorchester County of the following offenses and sentences were imposed as designated:

Indictment No. 2183—Storehouse breaking with intent to steal goods of the value of $100 and upwards; 5 years.

Indictment No. 2184—Storehouse breaking with intent to steal goods of the value of $100 and upwards (1st count); grand larceny (2nd count); 5 years on each count to run concurrently on each count but consecutively with the sentence in No. 2183.

Indictment No. 2185—Storehouse breaking with intent to steal goods of the value of $100 and upwards; 5 years to run consecutively with the sentences in No. 2183 and No. 2184.

On appeal from the judgments he contends:

I He was denied a speedy trial.

II The testimony of an accomplice was not corroborated.

III An oral statement made by him was improperly admitted in evidence.

IV The trial court erred in refusing to grant his request, made during the course of the trial, that his court appointed attorney be dismissed and new counsel be appointed to represent him.

I

## SPEEDY TRIAL

Every accused within the ambit of the Constitution of the United States is guaranteed a speedy trial by its sixth amendment. *Klopfer v. North Carolina*, 386 U. S. 213; *State v. Long and Nelson*, 1 Md. App. 326. Every accused under the jurisdiction of this State is also guaranteed a speedy trial by Article 21 of the Maryland Declaration of Rights and, in addition to these federal and State constitutional rights, has a statutory right, under certain circumstances, to a trial within a specified time by the provisions of Md. Code, Art. 27, §§ 616A-616R pertaining to interstate detainers and § 616S pertaining to intrastate detainers. And by Md. Rule 709 an accused not indicted may

seek an immediate trial upon petition waiving his right to action by the grand jury, § a, whereupon the State's Attorney shall immediately file an information against him (except in a case originating before a trial magistrate which is to be tried upon warrant) § b; when such petition has been filed the accused "shall be tried, without regard to term of court, within such reasonable time as to accord him a speedy trial." § c. We have considered the constitutional rights to a speedy trial and discussed the rules of law relating thereto in a number of cases from *Allen v. State,* 1 Md. App. 249 to *Frazier v. State,* 5 Md. App. 88. In *State v. Long and Nelson,* 1 Md. App. 326, we stated that the time within which trial must be had by the provisions of Art. 27, §§ 616A-S applied only to prisoners serving a sentence and against whom a detainer had been filed and held that there was no statutory direction, either directly or by implication, that all those accused of a crime must be tried within a specified time. But we have had no occasion to consider fully the provisions of §§ 616A-S or Md. Rule 709. The instant case, however, brings Art. 27, § 616S before us, as the appellant claims that he was not only denied his constitutional rights to a speedy trial but that a detainer was lodged against him for the crimes which are the subject of this appeal while he was a prisoner serving a sentence in a correctional institution under the jurisdiction of the Department of Correction, that he requested that he be tried and that he was not tried within the time prescribed by the statute.

*The Intrastate Detainer Act*

Chapter 628, Acts 1965, effective 1 June 1965, codified as Art. 27, § 616S,[1] applicable at the time of the appellant's trial on 7 March 1968,[2] provided in relevant part:

"(a) *Request by prisoner; statement from warden having custody.*—Whenever the Department of Cor-

---

1. Chapter 628 designated the section as 616A but since §§ 616A-R had been previously added by Chapter 627, Acts 1965 (Interstate Detainers) it was designated as § 616S.
2. Chapter 303, Acts 1968, effective 1 July 1968, amended the statute to make it applicable also to prisoners serving a sentence in any county or city jail.

rection receives a detainer against any prisoner serving a sentence in any correctional institution under the jurisdiction of the Department, any such prisoner shall be brought to trial within 120 days after the request of the prisoner for final disposition of the indictment, information, or complaint has been delivered to the State's attorney of the City of Baltimore or of the county in which the indictment, information, or complaint is pending and to the appropriate court; provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. The request of the prisoner shall be filed within 30 days of the prisoner's notification of any untried indictment, information, or complaint and shall be accompanied by a statement from the warden or superintendent having custody, setting forth the term of the commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the date of parole eligibility of the prisoner, and any decisions of the Board of Parole and Probation relating to the prisoner. The written notice and statement provided herein shall be delivered by certified mail.

(b) *Duty to inform prisoner.*—The warden or superintendent having custody of the prisoner shall inform the prisoner within 15 days in writing of the source and contents of any untried indictment, information, or complain against said prisoner concerning which the warden or superintendent has knowledge, and of the prisoner's right to make a request for final disposition thereof.

(c) *Dismissal when action not commenced.*—If action is not commenced on the matter for which request for disposition was made, within the time limitation set forth in subsection (a) above, the court shall no longer have jurisdiction thereof, and the untried indictment shall have no further force or effect; and in

such case the court shall enter an order dismissing the untried indictment with prejudice."

Obviously the objective of the Act was to assure a prisoner incarcerated in the designated institutions of this State against whom a detainer was filed on a charge to be prosecuted in this State, a trial on such charge within the time limitation upon delivery to the State's attorney and court of the prisoner's request. While the Act may be praised for its objective, it may be more damned for its provisions establishing the procedure to attain the objective. The provisions are vague, obscure and with one exception, lack sanctions to compel compliance with them.[3] In our discussion of the Act hereinafter "indictment" means "any untried indictment, information or complaint against a prisoner"; "warden" means "warden, superintendent or county or city law enforcement officer having custody of the prisoner"; "statement" means the statement from the warden specified in § 616S(a); and "request" means the request of the prisoner for final disposition of the indictment.

The Act first refers to the request of the prisoner in that part of subsection (a) providing that when a detainer has been received by the Department of Correction (and by amendment by any county or city jail) the prisoner shall be brought to trial within the time limitation after the request of the prisoner has been delivered to the appropriate State's attorney and court. It then provides that the request "shall be filed" within 30 days of the prisoner's notification of the indictment. It does not say who is to file the request or where it is to be filed. The Attorney General has interpreted the filing provision to mean that the request of the prisoner must be made by him within 30

---

3. The deficiencies are emphasized by comparison of the Maryland Act with the Uniform Mandatory Disposition of Detainer Act, 9B U.L.A. 365-368, the Kansas "Uniform Mandatory Disposition of Detainers Act", G.S. 1959 Supp. § 62-2901 through § 62-2905, and the Missouri "Uniform Mandatory Disposition of Detainers Law", V.A.M.S., §§ 222.080-222.150. Whether these deficiencies in the Maryland Act render it unconstitutional were not raised below. As the point was not tried and decided by the lower court, it is not properly before us and we do not consider it. Md. Rule 1085.

days of his notification of the indictment. 50 *Opinions of the Attorney General* 108. Although the opinion of the Attorney General does not expressly so state, the implication is that the request is to be filed by the prisoner with the warden. But the Act also provides that the request so filed shall be accompanied by a statement from the warden and "shall be delivered by certified mail." It would seem more logical not to require a time limitation for the making of the request by the prisoner but to require, when the request is made to the warden, that the warden file it within 30 days thereafter, accompanied by the statement, with the appropriate State's attorney and court. However the Act does not say that the filing should be within 30 days of the receipt of the request by the warden but within 30 days of the prisoner's notification of the indictment and it would be impossible for the warden to file the request if none had been made. But it would be impractical to require that the request filed with the warden be accompanied, as the Act provides, by a statement which must be made by the warden. On the other hand it would be equally impractical to require that it is the prisoner's obligation to obtain the statement from the warden and then to file it, within 30 days of his notification, with the State's attorney and court with delivery to them by certified mail. The prisoner may be without funds for the mailing and it would properly, by normal prison routine, have to pass through the hands of the prison officials in any event. We can only determine the legislative intent to have been that the prisoner file the request (no particular form is necessary) with the warden within 30 days of the prisoner's notification of the indictment and that it is the warden's obligation to prepare the statement and to deliver it by certified mail to the appropriate State's attorney and court. We recognize that by this construction there is no time limitation within which the warden is to so deliver the request and statement [4] and that the time limi-

---

4. The Uniform Act and the Missouri and Kansas Acts provide that the custodial official shall send the request and certificate (statement) "forthwith" to the court and presecuting official by registered or certified mail, return receipt requested. U.L.A. 9B, § 2; V.A.M.S., § 222.090 (Missouri); G.S. 1959 Supp. 62-2902.

tation within which the prisoner must be brought to trial dates from the time his request is delivered to the State's attorney and court. Thus the prisoner may be precluded from invoking the Act by the failure of the warden to deliver the request as required for no sanction is provided by the statute for such failure. While we may construe statutes within the legislative intent, we cannot enact legislation and we may not presume a sanction when none is provided.

Subsection (b) requires the warden to inform the prisoner within 15 days in writing of the source and contents of the indictment, concerning which the warden has knowledge, and of the prisoner's right to make a request for final disposition thereof. It does not specify when the 15 days start to run. We think the 15 day period would commence when the warden received knowledge of the indictment. As the Act contemplates that the detainer would be received by the Department of Correction, it assumes that the proper officials would then notify the warden; the warden would then have knowledge. However, the Act does not provide for such notification. As the time within which the prisoner shall be brought to trial runs from the time his request is delivered to the State's attorney and court, as he cannot make the request until he is notified of the indictment, as he need not be notified of the indictment until the warden has knowledge of it, as the warden would not have the requisite knowledge of it until he was informed about the detainer, and as there is no requirement that the warden be notified of the detainer, the prisoner would be precluded from invoking the Act or the invoking of the Act by the prisoner could be indefinitely delayed by the mere failure or delay of the proper officials to notify the warden that the detainer had been received. We do not feel that the knowledge of the Department of Correction as to an indictment, obtained by receipt of a detainer, is knowledge of the warden. The Act specifically provides that the information as to the indictment is that concerning which the warden has knowledge. We can only take this to mean actual knowledge, for the warden could not inform the prisoner of that which he had only constructive knowledge. And, in any event, even if the warden had actual knowledge of the indictment and failed to give the prisoner the information required, the prisoner would

not be entitled to relief under the provisions of the statute; again there is no sanction provided for such failure.[5]

Subsection (c) of the Act provides that if "action is not commenced" on the matter for which request is made within the time limitation set forth in subsection (a) the court no longer shall have jurisdiction, the indictment shall have no further force or effect and the court shall order its dismissal with prejudice. We interpret "action" to mean trial. The time limitation set forth in subsection (a) specifically refers to the trial of the prisoner. We do not think that any other "action" than the trial was intended by the legislature. The Act does not define "action" and we believe that any other interpretation would render the Act so impotent as to substantially affect the attainment of its objective.[6]

As we construe Md. Code, Art. 27, § 616S, applicable at the time of the appellant's trial, it provides:

> 1) a warden having knowledge of an indictment pending in this State against a prisoner in his custody, such knowledge having been obtained by notice to the warden of a detainer received by the Department of Correction, shall inform the prisoner in writing, within 15 days of the obtaining of such knowledge, of the source and contents of the indictment and of the prisoner's right to make a request for final disposition of it.

---

5. The Uniform Act and the Missouri and Kansas Acts provide that the prisoner be "promptly" informed of the indictment and of his right to make the request and that if he is not so informed within one year the prisoner is entitled to a final dismissal of the indictment. U.L.A. 9B, § 1(c); V.A.M.S., § 222.080-3 (Missouri); G. S. 1959 Supp. 62-2901[c] (Kansas).

6. The Uniform Act and the Missouri and Kansas Acts provide specifically that if the indictment is not brought to "trial" within the time limitation specified the sanction is invoked. The time limitation suggested in the Uniform Act is 90 days from the receipt of the request and certificate by the court and prosecuting official. In the Missouri and Kansas Acts it is 180 days. In each Act the time limitation is subject to extension as in the Maryland Act. U.L.A. 9B, § 3; V.A.M.S., § 222.100 (Missouri); G. S. 1959 Supp. § 62-2903 (Kansas).

2) the prisoner may, within 30 days of the receipt of such information, make a request, in writing, for final disposition of the indictment and deliver it to the warden.

3) upon receipt of such request the warden shall prepare a statement as to the matters specified in subsection (a) and deliver a copy of the request and statement to each of the State's attorneys and the appropriate court in the jurisdiction where the indictment is pending.

4) the indictment shall be brought to trial within 120 days of the receipt of the request and statement by the State's attorney and court; except that for good cause shown in open court, in the presence of the prisoner or his counsel, the court may grant any reasonable or necessary continuance; if trial is not commenced within such time limitation the court shall no longer have jurisdiction, the indictment shall have no further force or effect and the court shall order it dismissed with prejudice.

Thus the Act assumes that all parties concerned will do what its provisions call upon them to do but it provides a sanction for failure to do so in only one instance, i.e., when the prisoner is not brought to trial within the time limitation after his request and the warden's statement have been delivered to the appropriate State's attorney and court. But the court does not lose jurisdiction and the indictment still has force and effect and shall not be dismissed with prejudice for any other failure to comply with the provisions, not only on the part of the prisoner but also on the part of the State's authorities. So the Act is not invoked if the warden fails to inform the prisoner as required either because he has not received knowledge of a detainer from the Department of Correction or having received such knowledge he fails to inform the prisoner. Nor is it invoked when the warden, having knowledge of the detainer, informs the prisoner and the prisoner files his request, but the warden fails to deliver the request, accompanied by the statement, to the appropriate State's attorney and court. In other

words, the Act is invoked only when there is full compliance with its provisions, short of bringing the prisoner to trial within the time limitation.

We now turn to the instant case. Prior to trial the appellant filed a motion to dismiss the indictment. At a hearing on the motion preliminary to trial he testified and offered evidence. He said that while he was incarcerated in the Maryland House of Correction he was delivered, in June or July of 1967, a slip of paper by an inmate—"They put it in the mail and your mail goes to the jail and your inmate gives out your mail and I was given this piece of paper * * * I have never been officially notified." The slip said, "You have a detainer against you by the Maryland State Police." On 15 September 1967 he was in the Maryland Penitentiary and he wrote "The Chief Judge for Dorchester County" that he had a detainer filed against him from Dorchester County. He asked that certain evidence be suppressed and for "a speedy trial, before the case and evidence gets too old." He said he also had detainers against him in Frederick County and Caroline County. On 2 October he wrote the State's Attorney for Dorchester County that he had been "advised by the authorities here" that charges of breaking and entering and larceny had been placed against him, that he was serving a 5 year sentence imposed by the Circuit Court of Washington County, that his wife had just given birth to their first child, and asked that the State "consider the possibility of Nolle Prosse" of the pending charges. On 12 October he received a reply from the State's Attorney for Dorchester County that his letter was being referred to Judge C. Burnham Mace and "we are taking into consideration the matters therein contained. You will hear from us at a later date." He said that before he wrote the letter of 2 October he went to the classification officer of the penitentiary and asked about the detainer. The officer told him he had a charge pending in Dorchester County "but I have got nothing to do with this, it happened while you was at the House of Corrections." The officer suggested he write the State's Attorney. After further discussion the officer "carried it to the warden and the warden told him at that time that he was supposed to have filled out some kind of form or something. He said he didn't—it wasn't his responsibility, that

they was supposed to have done it at the House of Corrections. Since they didn't do it at the House of Corrections it wasn't his job to do it. We had a big argument about that and everything." On 26 December he received a letter from the State's Attorney for Dorchester County. It stated that the detainers were still pending, that he would be tried on the charges of breaking, entering and larceny, that "your friends Franklin Eugene Safrit and William Crouse Happel have been tried and both pleaded guilty," that "we recovered all evidence including the safe in Marshy Hope Creek and you will be tried on these charges." It asked, "In view of the information contained above, do you still want a speedy trial? If you do please advise us and we will have a preliminary hearing immediately." On 3 January 1968 the appellant replied to the letter. He said he was serving a 5½ year sentence, that he had been convicted of breaking and entering in Frederick and was awaiting sentencing, that "in view of the time already given and with what I will get from Frederick I was hoping your office would see fit to drop your detainers." However, if he was to be tried he wanted a speedy trial and an attorney. Copies of the letters were admitted in evidence. He testified that when he first heard about the detainers the warden or superintendent did not inform him of "anything." He had never seen the detainer and specifically had not been told of his "right to a speedy trial and what you had to do." As to the slip he received, "the inmates get hold of slips given out the same way, and they have a habit of typing on typewriters and putting different charges, and actually, I didn't know if this was official or not." On cross-examination it was elicited that an attorney had been appointed to represent him on 5 January 1968 apparently as a result of his letter of 3 January 1968 and that the attorney had conferred with him at the penitentiary. On redirect examination he said he was prejudiced by the delay in trial "because of the time that was involved." He wanted certain witnesses and "these witnesses scattered." The witnesses could have testified that after the commission of one of the crimes of which the appellant was charged one of the co-defendants told in their presence how he and the other co-defendant went to the back and "all the other stuff that is supposed to have happened" and that the appellant

laughed and said "this is one he got that I didn't get, and all of that stuff." Another witness would testify that Happel (at the time of the trial Happel had pled guilty to the crime) thought the appellant "had snitched on him * * * and he would get even with me even if he had to come down here and plead guilty and say I was with him and implicate me and everything else." Two of the witnesses—the appellant's mother-in-law and Happel's girl friend—had "disappeared." He said he was also prejudiced by the detainers because he came up for parole in February 1968 and the Board asked him about the detainers. He felt it "hindered" his parole. The State did not offer evidence. With regard to the Intrastate Detainer Act, defense counsel argued that the indictments should be dismissed because the warden had not given the appellant the required information concerning them and that he was prejudiced. The court said it was of the opinion "when we consider all of these circumstances * * * that there has been no unreasonable delay which would prejudice the defendant and, that it would appear that the matter proceeded normally." It denied the motion to dismiss.

The evidence did not establish that the appellant made request for final disposition of the untried complaints within 30 days of notification of them. The Act was not available to the appellant for that reason. Even on an assumption that the letter of 15 September 1967 was such request, and that it was filed on time, it was not accompanied by a statement from the warden containing the information required by the Act. The Act was not available to the appellant for that reason. And even if the evidence before the court be considered as showing that the appellant was precluded from filing the request as required because the warden, although he had knowledge, did not inform the appellant of the source and contents of the untried complaints and of the appellant's right to request final disposition thereof,[7] no relief was available to the appellant under

---

7. The testimony of the appellant was to this effect and it was uncontradicted. We also assume that it was uncontroverted and undisputed. However, we note that there is a distinction between uncontradicted evidence which a trier of fact might disbelieve and uncontroverted or undisputed facts which present only a question

the Act. And even had the evidence proved that the appellant made request as required but that the warden failed to deliver it, accompanied by the statement, to the appropriate State's attorney and the court, no relief was available to the appellant under the Act. In short, for reasons we have herein before stated, since it was not established that the appellant and the prison officials did all that they were called upon to do by the provisions of the Act, the Act was not invoked, no matter where the fault lay.

On the issue that the appellant was not brought to trial within the time required by Md. Code, Art. 27, § 616S, we find no error in the denial of the motion to dismiss the indictments.

### The Constitutional Aspects of the Delay in Trial

The appellant was indicted on 16 January 1968 and went to trial on 7 March 1968. We think it obvious that the period between 16 January 1968 and 7 March 1968 was not a delay in the constitutional sense. See *Stevenson v. State,* 4 Md. App. 1. The offenses alleged were committed on 12 November 1966. The Court of Appeals and this Court have held in cases where the contention of denial of a speedy trial stemmed from delay in indictment that the answer was that until the Grand Jury acted there was no case to be tried. *Montgomery v. State,* 4 Md. App. 473, 479, and cases cited therein; *Falcon v. State,* 4 Md. App. 467. The Grand Jury may act within the applicable period of limitations. *Osborne v. State,* 3 Md. App. 161, 163. We said in *Montgomery,* at 480, that adhering to the rule that until a grand jury acts there is no case to be tried and thus there could be no denial of a speedy trial prior thereto, does not stand a defendant defenseless against unreasonable, oppressive and capricious delay on the part of the State in obtaining an indictment. We noted that a defendant, in appropriate circumstances, could invoke Md. Rule 709 and that a delay in obtaining an indictment may constitute denial of due process of law. In the circumstances of this case, we see no denial of due process of law by delay in indicting the appellant. Nor do we believe that any delay in the circumstances here was a consti-

of law. Facts may be uncontradicted and at the same time be disputed or controverted. *Edwards v. State,* Memorandum on Motion for Reargument, 198 Md. 132, 158.

tutional denial of a speedy trial in any event. The essential ingredient of a speedy trial is not mere speed but orderly expedition. *Bryant v. State*, 4 Md. App. 572; *Tillery v. State*, 3 Md. App. 142; *Kelly v. State*, 2 Md. App. 730. We cannot find from the evidence that the delay was purposeful or oppressive on the part of the State or that the appellant, having made demand for a speedy trial, but the delay being less than substantial, showed such strong possibility of prejudice as to compel dismissal of the indictments. *Stevenson v. State, supra.* See *Frazier v. State*, 5 Md. App. 88; *Johnson v. State*, 4 Md. App. 648.

On the issue that the appellant was not brought to trial within the constitutional guarantees of a speedy trial, we find no error in the motion to dismiss the indictments.

## II

### CORROBORATION OF THE ACCOMPLICE'S TESTIMONY

The appellant was convicted of breaking with intent to steal goods of the value of $100 and upwards, from the storehouse of Parker's Inc., the storehouse of Fleetwood & Wilson Company and the storehouse of Maryland National Bank, each located in Hurlock, Maryland. He was also convicted of grand larceny of goods of the Maryland National Bank. All the offenses were alleged to have been committed on 12 November 1966. On appeal the appellant does not contest the proof of the *corpus delicti* of the crimes and he concedes that the testimony of the accomplice, William Crause Happel, as to his criminal agency was corroborated as to the breaking of the Maryland National Bank and the larceny of its goods. But he claims that there was no corroboration of Happel's testimony as to his participation in the other two storehouse breakings. Happel testified that for several weeks prior to 12 November the appellant rented a room in Happel's mother's house in Baltimore. The appellant made two telephone calls to Dorchester County "in an effort to locate Mr. Eugene Safrit," the last one on 10 or 11 November. Happel and the appellant went to Safrit's home, arriving about 9:00 or 10:00 P.M. on 11 November. The next night Safrit drove them to the Maryland National Bank

in Hurlock and Happel and the appellant broke into the bank
and stole a small safe which they put in the car driven by Sa-
frit. They drove to "somebody's chicken house," broke open
the safe, took money out of it, put the money "into a suit-
case like bag," put the safe back in the car, drove to a bridge,
threw the safe over the side and drove back to Safrit's house.
(The safe was subsequently recovered by the police. Over $300
was taken from it.) "We drove around a couple of times and
we went to the oil company and to another company—some kind
of Western Union, and then we went back to Eugene's house."
He said the appellant went back to Baltimore that night. Asked
further about the other places they went, Happel said, "We
went to some sort of a small company. I don't know what it
was. It had a Western Union sign hanging in front of it. I
believe it was a hardware. * * * We went into there, and after-
wards—there was nothing in there, it was a disappointment be-
cause nothing was gotten there. We went to an oil company
and tried to open the safe in the oil company which was un-
successful also." The safe in the "other place was open * * *
it had a note on there, said the safe was open." Safrit gave
them their share of the loot from the bank at his house—it was
a change safe but Safrit gave them their share in bills "in-
stead of having us carry the change because of this money was
in change." Happel did not further identify the "oil company"
or the other company they broke into. The testimony of Sa-
frit's wife placed the appellant in the company of Happel and
her husband immediately before the commission of the crimes
and immediately after. Her diary, placed in evidence, showed
under date of 10 November 1966 that "Nigro King," identified
by her as the appellant, called. Under 11 November the diary
read, "company here." She indicated the "company" was King
and Happel. "They stayed all day and up until about 4:00 or
5 o'clock the next morning." She identified as hers a bottle in
which Happel said Safrit put the change from the bank safe.
She identified a picture of the Safrit car and said that "the safe
they had broke the upholstery on the door." On cross-exami-
nation she said about 3:00 or 4:00 A.M. she heard "this rumble
in the driveway and I looked out the window and I seen Mr.
King—that man there (indicating the appellant) take a weird

looking suitcase out of the back of our car and transfer it into his, which he had was an old jalopy which had temporary tags on it."

This testimony of Mrs. Safrit tended to show that the appellant was identified with the perpetrators of the crimes and corroborated the accomplice's testimony within the meaning of the rule requiring corroboration. *Boone v. State,* 3 Md. App. 11, 19-20. The *corpus delicti* of each of the crimes was proved and Happel's corroborated testimony clearly showed the criminal agency of each of Happel, the appellant and Safrit as to the breaking of the Maryland National Bank and the larceny of its safe containing more than $100. The question as to the breaking of Parker's Inc. and Fleetwood & Wilson Company, however, is not as the appellant presents it. It is not a question of whether Happel's testimony was corroborated (we think that it was by the testimony of Mrs. Safrit) but a question of whether Happel's testimony or other evidence proved that the appellant committed the breaking of the storehouse of Parker's Inc. and Fleetwood & Wilson Company even though there was evidence that those storehouses had been broken on 12 November. Happel testified that after stealing the safe from the bank they went to "the oil company" and to "another company — some kind of Western Union * * * we went to some sort of a small company. I don't know what it was. It had a Western Union sign hanging in front of it. I believe it was a hardware." He said we "tried to open the safe in the oil company which was unsuccessful." The safe in "the other place" was open— "it had a note on there, said the safe was open." There is nothing in this testimony to establish that "the oil company" and the other company was Fleetwood & Wilson and Parker's. Sergeant Emil Meyers of the Maryland State Police, testifying for the State, gave the substance of an oral statement made by the appellant, which the lower court, after receiving evidence out of the presence of the jury, determined preliminarily to have been freely and voluntarily made. The appellant told the police about the breaking of the Maryland National Bank and the larceny of the safe.[8] The sergeant then said, "He also mentioned that they had pulled two other jobs right in the same

---

8. This statement also corroborated the accomplice's testimony as to the offenses with respect to the Maryland National Bank.

town. One of them he knew and, I think it was at my naming of the Pure Oil Company. The other building he didn't know what it was, but it was a building within the area of Hurlock." The sergeant further testified that he was "in on the investigation" of the "Parker Implement Company" job and "in on the one on Fleetwood and Wilson" job. He said, "The Parker Implement Company was broken into through a side rear door. The side rear door would be facing the center of Hurlock and this is the method of entry in that establishment." It was a "forceful entry." As to Fleetwood & Wilson, "entry was made through a front door * * * It was forced and there were markings on the door." The sheriff of Dorchester County (he was chief deputy sheriff on 12 November 1966) said he knew of the breaking that occurred at "Parker Implement Company." Asked what type of business that company operated, he said, "It's International Harvester, farm implements." He also knew of the breaking in the "Fleetwood and Wilson Oil Company in Hurlock." Eugene Safrit was a witness on behalf of the defense. He testified as to the Maryland National Bank breaking and larceny but did not mention the other two crimes on direct examination and was not asked about them on cross-examination. We think that the lower court erred in denying motions for judgment of acquittal, made at the close of all the evidence, as to the indictments charging the breaking of the storehouse of Parker's Inc. and the storehouse of Fleetwood & Wilson Company. We feel that the evidence before the court did not show directly nor did it support a rational inference of the fact that it was the storehouse of Parker's Inc. and the storehouse of Fleetwood and Wilson Company that were broken from which the jury could fairly be convinced beyond a reasonable doubt of the appellant's guilt as charged. See *Williams v. State,* 5 Md. App. 450. There was nothing in Happel's testimony to show that Fleetwood & Wilson was the "oil company," the storehouse of which he said the appellant broke or that the other storehouse was that of Parker's Inc. Although the appellant told the police sergeant they had pulled two other jobs in addition to the bank, and knew one building, "The Pure Oil Company," he did not know the other building. There was no evidence to show that "The Pure Oil Company" re-

ferred to "at the naming" by the sergeant was Fleet-
wood & Wilson and even though the sheriff referred to the
"Fleetwood and Wilson Oil Company" there is no showing
that this was the oil company designated by Happel or the
appellant. There was no evidence that Parker's Inc. had a West-
ern Union sign in the front or that it was a hardware store
as described by Happel. The sheriff described it as "Interna-
tional Harvester—farm implements" which did not identify it
as the building referred to by Happel or the appellant. Neither
Happel nor the appellant described how the storehouses they
entered were broken and the testimony by the sergeant and the
sheriff as to how entry was gained to the storehouses of Fleet-
wood & Wilson and Parker's did not identify them as the build-
ings referred to by Happel and the appellant. There was no evi-
dence that it was the safe in Fleetwood & Wilson's storehouse
which had been left open with a note therein so stating or that
the safe in Parker's showed that an unsuccessful attempt had
been made to force it open so as to identify those establishments
as the ones to which the accomplice and the appellant referred.
Other than being in Hurlock, the location of the storehouses
was not determined. Safrit did not mention the "other jobs"
and no official or employer of Fleetwood & Wilson or Parker's
testified. It may well be that the breakings of the storehouses
of Fleetwood & Wilson Company and Parker's Inc. were com-
mitted by the appellant, but we do not believe that the evidence
was sufficient for the jury to be so fairly convinced beyond a
reasonable doubt. We find that the lower court erred in deny-
ing the motions for judgment of acquittal as to indictments
Nos. 2183 and 2185.

## III

### THE STATEMENT

The appellant contends that the oral statement made by him
was improperly admitted in evidence. He does not claim that
the statement was obtained by threat, promise or inducement
but that there was not complete compliance with the procedural
requirements of *Miranda v. Arizona,* 384 U. S. 436, and in par-
ticular that he was not advised that he had a right to have
counsel present at all times during the questioning and that the

State did not show that he waived his rights. This contention assumes that the challenged statement was obtained by a custodial interrogation within the meaning of *Miranda;* we do not think that it was so obtained.

Sergeant Meyers testified that shortly before 16 June 1967 he received an order from the Waterloo Barracks of the Maryland State Police to go to the House of Correction. A prisoner named Robert King "requested to talk to a trooper from the eastern shore." On 16 June he went to the institution and saw the appellant. They were escorted to a private room, the Sergeant identified himself and told the appellant he was there in response to his request to see a trooper. The Sergeant did not know who the appellant was and did not know what the appellant wanted to talk about. The appellant told him "he wanted to clear up what cases he was involved in on the eastern shore and that he was willing to tell me all about them." The Sergeant thought it was his duty to inform the appellant of his constitutional rights at this point and gave him the *Miranda* warnings. The appellant "smiled and indicated he knew all this." He "then proceeded in narrative form to tell about the storehouse breakings in Hurlock on 12 November 1966." The appellant testified that Meyers told him he had received word that the appellant wanted to talk to the Maryland State Police. "And when he introduced himself he said he was from down here (the eastern shore), and I went ahead and told him I was talking about the Maryland State Police that could handle all these charges pending in all the counties." The Sergeant said that he could not help him "about all the counties." The "constitutional rights came up" and the Sergeant said, "You know all that stuff * * * You know what your constitutional rights are * * * No need of me going into all of that." The appellant then "had a conversation" with the Sergeant about the charges on the eastern shore. In rebuttal the Sergeant denied the appellant's version regarding the constitutional rights and said that he "went over each of these points (the *Miranda* warnings) precisely" and repeated in detail the warnings given.

The Sergeant, out of an abundance of caution, followed the *Miranda* procedures, but we do not think it was necessary in the circumstances. Even though the appellant was "in custody"

by reason of his incarceration for an unrelated offense we do not believe that the challenged statement was obtained under circumstances likely to affect substantially the appellant's will to resist and compelled him to speak where he would not otherwise have done so freely. See *People v. Rodney P.*, 233 N.E.2d 255, 286 N.Y.S.2d 225. The dangers *Miranda* intended to guard against were here not present. We do not think that the appellant was "swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to * * * techniques of persuasion." (*Miranda* at p. 461). Rather the lower court here could have properly found from the evidence that the appellant was confronted by the police at his request, that he talked without being subjected to questioning and that he made the statement willingly and without persuasion.[9] Thus the statement was not obtained by a "custodial interrogation" within the *Miranda* concept. See *Gaudio and Bucci v. State,* 1 Md. App. 455. The statement being otherwise free and voluntary, it was admissible. The giving of the *Miranda* warnings was more than that to which the appellant was entitled, and any defect in them, if there was any defect, was immaterial. We find no error in the admission of the statement.

## IV

### THE REQUEST TO DISMISS COUNSEL

On the morning of the second day of trial the appellant requested a conference, out of the presence of the jury, with the judge, defense counsel and the State's Attorney. Those persons conferred in the judge's chambers in the presence of the sheriff. The appellant wanted his appointed counsel dismissed because "I don't feel that I am being represented by the rights." He complained that counsel had not cross-examined Mrs. Safrit "the way he should" although he also said, "I don't want to tell the truth about the things—I'm afraid of getting Mrs. Safrit in trouble." He suggested that Franklin Eugene Safrit, a co-defendant, already convicted and serving a sentence, and who was to testify for the State, had been represented by his

---

9. The instant case is thus factually distinguishable from *Hunt v. State,* 2 Md. App. 443.

counsel,[10] but counsel made clear that he had brought this to the appellant's attention about the middle of January and had asked the appellant "if you were satisfied that I could handle your case even though you knew that I had represented Safrit at his guilty plea" and had received no indication from the appellant that he did not desire counsel to continue to represent him. He said that the motion to dismiss the indictments had not included as a ground that copies had not been given him but the docket entries read, "Copies issued in duplicate, with copy of Indictment and True Bill for the Defendant." And the court said that it would "entertain it now as a separate ground as a motion to dismiss" and overruled it. The appellant raised other matters with regard to the conduct of the proceedings which he alleged denied him a fair trial which the court deemed to be without substance and we agree. It was the opinion of the court that the appellant's counsel was "entirely competent and has represented you adequately so far." We see nothing in the record to indicate otherwise and find no error in the denial of the request to dismiss defense counsel in the middle of the trial.[11]

> *As to No. 2184 criminal law: judgments affirmed; as to each of No. 2183 and No. 2185 criminal law: judgment reversed and remanded for a new trial.*

THOMPSON, J., dissenting:

I cannot agree that the trial judge erred when he denied the motion for judgment of acquittal as to indictments nos. 2183 and 2185. Since the evidence to support these indictments is fully set out in the majority opinion I shall not repeat it except to

---

**10.** Franklin Eugene Safrit was not called by the State but by the defense and testified in behalf of the appellant.

**11.** At the time of sentencing the lower court told the appellant, "[I]n my opinion your attorney had ably defended you with what he had to work on. I think that you didn't have a great deal to work with. In the opinion of this court you have been ably defended. Your record is terrible. There is not a break in it. It starts in '48 when you were quite young; but there is little break in it since then."

point out that the evidence showed that three separate breaking and enterings occurred within the town of Hurlock during the night of November 12, 1966. The town of Hurlock, according to the 1960 census, had a population of only 1,035 people.[1] I think it most unlikely that more than three such crimes occurred within such a small community on the same night and that this inference, together with the other testimony, clearly tied in the accomplice's testimony to the two indictments in question and to the testimony of the other witnesses. I point out first: that a motion to acquit should be denied if there are rational inferences or credible evidence to support the verdict, see *Williams v. State, supra* (majority opinion) and secondly: that it is unnecessary for the state to prove guilt to a mathematical certainty; a moral certainty is sufficient. *Pettis v. State,* 2 Md. App. 651, 236 A. 2d 429, *Johnson v. State,* 227 Md. 159, 175 A. 2d 580. Judge Anderson joins in this dissent.

---

**1.** This is a matter of which the court could take judicial notice. See *Line v. Line,* 119 Md. 403, 407, 86 A. 1032 (the calendar); *Dean v. State,* 205 Md. 274, 107 A. 2d 88, 91 (That certain streets are located in Baltimore City) and 1 Jones: *Evidence* § 142, n.7 (5th Ed.) (the census).