**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Leonard B. RICKETSON, Defendant-
Appellant.**

**No. 73–1618.**

United States Court of Appeals,
Seventh Circuit.

Heard Feb. 26, 1974.

Decided May 30, 1974.

Certiorari Denied Oct. 29, 1974.
See 95 S.Ct. 227.

George E. Faber, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD and CUMMINGS, Circuit Judges, and JAMESON,* Senior District Judge.

CUMMINGS, Circuit Judge.

In February 1972, a 3-count indictment was returned against defendant and Leo Rugendorf, Francis Hohimer

---

* Senior District Judge William J. Jameson of the District of Montana is sitting by designation.

and Colin Green. The charges involved a jewelry theft that took place in Indianapolis, Indiana, on June 16, 1967. The first count charged the four defendants with a conspiracy to transport in interstate commerce jewelry worth more than $5,000, and to receive it and sell it —all in violation of 18 U.S.C. § 371, the general conspiracy statute. Count II charged them with transporting the jewelry from Indianapolis to Chicago in violation of 18 U.S.C. §§ 2 and 2314. The final count charged that defendant Rugendorf received the same jewelry in interstate commerce, knowing it to have been stolen, in violation of 18 U.S.C. §§ 2 and 2315. Sections 2314 and 2315 forbid the transportation and sale or receipt of stolen goods with a value of $5,000 or more; Section 2 is the general aiding and abetting statute.

Early in the morning of June 16, 1967, the Indianapolis residence of Mr. and Mrs. Nicholas Noyes was burglarized by Ricketson, Green and Hohimer. Later that morning in Chicago, Rugendorf picked up the jewelry at Hohimer's apartment. That afternoon an unidentified person gave Rugendorf $20,000 for the jewelry. Rugendorf turned the money over to Hohimer. The next day Rugendorf augmented the sum by giving Hohimer an additional $700. Hohimer paid his brother Wayne $50, Green $200 and Ricketson $700, retaining the balance.

Hohimer and Green pled guilty and became government witnesses. Rugendorf was severed due to ill health [1] and testified from a hospital bed on behalf of Ricketson, who stood trial alone. After a jury trial, Ricketson was convicted on Counts I and II as charged and on May 2, 1973, received a 3-year sentence concurrent to his prior five to ten-year sentence on a state charge of burglary, theft and bribery. After receiving his federal sentence, Ricketson was paroled from the Illinois State Penitentiary and delivered to the Federal Correctional Institute at Sandstone, Minnesota on June 30, 1973.

*Pre-indictment Delay*

■ Defendant urges that his Sixth Amendment right to a speedy trial was violated because of the 56-month period between the June 1967 offense and the return of the indictment on February 22, 1972, four months before the expiration of the five-year statute of limitations (18 U.S.C. § 3282). However, in United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468, the Supreme Court held that the Sixth Amendment speedy trial provision does not apply until a putative defendant becomes an accused. Targeting a suspect for investigation does not make him an accused for this purpose. United States v. Joyce, 499 F.2d 9 at 19–20 (7th Cir. 1974). Consequently, even if the Government knew of defendant's involvement in the Noyes burglary at an early date, his right to a speedy trial did not accrue until indictment.

■■ Although the Sixth Amendment cannot be violated by pre-indictment delay, *Marion* indicated that the due process clause of the Fifth Amendment would be violated if pre-indictment delay caused substantial prejudice to a defendant's right to a fair trial and was purposely occasioned by the Government to obtain a tactical advantage over him. 404 U.S. at 324. Defendant does not claim that his trial was prejudiced by the delay. His only claim of prejudice is that his state parole was affected and any advantage of concurrent sentencing was minimized. Although this could be prejudicial for speedy trial purposes (Smith v. Hooey, 393 U.S. 374, 378, 89 S.Ct. 575, 21 L.Ed.2d 607), it did not prejudice defendant's due process right to a fair trial. Nothing in United States v. Hauff, 461 F.2d 1061, 1067–1068 (7th Cir. 1972), or the pre-*Marion* case of United States v. Strauss, 452 F.2d 375, 377–378 (7th Cir. 1971), is to the contrary. Those cases rejected

---

1. Rugendorf died before his trial took place.

claims similar to defendant's as "speculative, * * * almost fanciful," "conjectural, if not frivolous * * *." They therefore had no occasion to consider whether a serious claim of prejudice to parole or concurrent sentencing rights would be legally relevant under the due process clause to pre-indictment delay. We hold that it is not.

■ Furthermore, defendant has shown no intentional delay by the Government to obtain an advantage over him. The Government has represented that "the facts and circumstances surrounding this crime did not come to its attention until Summer, 1971." The FBI's 1967 interview with Mrs. Marguerite Lilly Noyes, the victim, does not cast doubt on this representation, for her interview with the FBI disclosed no information as to the identities of the masked participants in the burglary. Since neither intentional delay nor prejudice to a fair trial have been shown by defendant, the pre-indictment delay did not violate the due process clause. United States v. Marion, *supra*, at 325–326.

*Post-indictment Delay*

Defendant also urges that his Sixth Amendment right to a speedy trial was violated by the eleven-month delay between his motion for immediate trial and trial. As noted, defendant was indicted in February 1972. He filed a single motion for immediate trial in April 1972, but it is clear from his accompanying memoranda that he was really seeking relief in the form of dismissal for pre-indictment delay and a limitation on the Government's proof at trial. This was the argument and request for relief under the heading "Motions to Dismiss and An Immediate Trial" in the first memorandum; immediate trial was not mentioned in defendant's reply memorandum, after the Government had represented that it was ready for trial but that defendant had sought two continuances. The district judge denied the relief requested and never ruled on the motion for immediate trial; defendant did not complain that this was an oversight.

■ The four-part balancing test of Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101, requires us to consider the length of delay, the reason for the delay, defendant's assertion of right, and the prejudice to the defendant.

■ As to the length of delay, longer periods have been tolerated in speedy trial cases. For example, United States v. DeTienne, 468 F.2d 151 (7th Cir. 1972), involved a 19½-month pre-trial delay. But eleven months is substantial, and the reasons for the delay are unclear. The case is not particularly complex, although in fairness to the Government, we note that its problems of proof must have been much more difficult before Hohimer's September 11, 1972, guilty plea. The Government speculates that "some delay was occasioned by Rugendorf's health problems and the time necessary for Hohimer and Green to decide to change their pleas." We can judicially note that the trial judge was newly appointed when this indictment was returned; he therefore had a number of cases older than this one reassigned to him from other judges. The docket sheet shows that pre-trial motions were decided on May 5, 1972, and that thereafter there were status calls on May 24, June 22, September 15, and October 10. Mrs. Noyes' deposition and Hohimer's guilty plea are the only events of significance in this five-month period. Thereafter, trial dates of November 27, 1972, and February 20, 1973, were set and vacated; there was a status call on December 20, 1972. Trial commenced on March 5, 1973. During this five-month period, Rugendorf was severed, Green pled guilty, a pre-trial conference was held, and subpoenas were issued. The record before us does not indicate why progress was so slow. The proceedings at each status call and vacated trial date have not been transcribed. But at each session, Judge McLaren entered an order setting the date for the next. We must

assume that he had sufficient reasons each time he vacated a trial date, or set the next status call relatively far into the future. Defendant's speedy trial claim is in practical effect an attack on those orders. Appellant must therefore assume the burden of explaining why Judge McLaren's reasons for delay were insufficient, and of providing a record on which his claims can be evaluated. He has not done so. It is also noteworthy that the docket sheet shows no Government requests for continuances. We conclude that adequate reason existed for the delay.

Although, as seen, defendant initially sought an early trial, there is no indication he pressed the point thereafter. His one *pro forma* demand is not entitled to great weight.

As noted, defendant's only claim of prejudice is that his total period of incarceration might have been lengthened by the eleven-month delay, since he was paroled by the Illinois Parole Board the month after the district court imposed a three-year federal sentence concurrent with the state sentence.[2] However, any prejudice was minimized because Judge McLaren sentenced defendant under 18 U.S.C. § 4208(a)(2) and said explicitly that he did so because of defendant's lengthy state imprisonment. We do not suggest that sentencing under § 4208(a)(2) was a remedy for the lack of a speedy trial. United States v. Strunk, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56. Rather, we hold that it is one factor which is relevant to whether a speedy trial was denied.

■ In light of our conclusions on length of delay, reasons for delay, and demand for speedy trial, we conclude that defendant has shown insufficient prejudice to establish a Sixth Amendment violation. See United States v. Cabral, 475 F.2d 715, 719–720 (1st Cir. 1973); United States v. Taddeo, 434 F. 2d 228 (2d Cir. 1970), certiorari denied, 401 U.S. 944, 91 S.Ct. 957, 28 L.Ed.2d 226; United States v. Lebosky, 413 F.2d 280 (3d Cir. 1969), certiorari denied, 397 U.S. 952, 90 S.Ct. 977, 25 L.Ed.2d 134. United States v. Strunk, 467 F.2d 969 (7th Cir. 1972), reversed on other grounds, 412 U.S. 434, does not require a contrary result.[3] There the reasons for delay were unacceptable, and defendant had repeatedly demanded a speedy trial. As we pointed out in *DeTienne* in language applicable here, prejudice inferable from incarceration "unenhanced by tangible impairment of the defense function and unsupported by a better showing on the other factors than was made here, does not alone make out a deprivation of the right to speedy trial." 468 F.2d at 158.

### Impact of Interstate Agreement on Detainers Act

■ The Interstate Agreement on Detainers Act became a federal law in 1970 and is reproduced in Title 18 U.S.C.A. Appendix at pp. 136–141 of the 1974 Supplement. Illinois joined the Agreement in 1971. Ill.Rev.Stats.1971, ch. 38, § 157–31. The Illinois act is now codified at Ill.Rev.Stats.1973, ch. 38, § 1003–8–9. Before the oral argument, we asked counsel to be prepared to discuss their position with respect to the impact of this Agreement on pre-trial delay. We were told that the federal detainer was not lodged with the Illinois prison authorities until August 22, 1972.[4] Defendant's April 1972 motion for immediate trial and for dismissal because of pre-indictment delays of course did not rely on this Agreement, for no detainer

---

2. Defendant's brief states that the parole was in June of 1973 (Br. 4).

3. In *Strunk*, the Supreme Court required dismissal of the indictment because the Government did not cross-petition for certiorari as to whether defendant had been denied a speedy trial.

4. The record shows a Government motion for a "bench warrant and detainer," and the issuance of a bench warrant on July 18, 1972. We need not explore whether there was a further delay in lodging the detainer or a mistake at oral argument, since defendant was never in federal custody between July 18 and August 22.

had been filed. In any event, the 180-day requirement contained in Article III of the Act does not apply until the prisoner causes the written notice and certificate specified therein to be delivered to the court and prosecutor. Since this procedure was not followed, Article III is inapplicable.

■ Article IV requires commencement of the trial of a prisoner against whom a federal detainer has been lodged within 120 days of the arrival of the prisoner in federal custody pursuant to written request of the "appropriate" federal officer (presumably the United States Attorney), approved and transmitted by the district court. Article IV also requires trial before the prisoner is returned to state custody. We will assume that the Writs of Habeas Corpus Ad Prosequendum issued in this case are requests for purposes of the Agreement. According to the record and the representations at oral argument, the first time after August 22, 1972, that defendant was received into federal custody was March 1, 1973. His trial took place on March 5–7, well within the 120-day limit and before he was returned to state custody on May 4.

Defendant's position at oral argument was based on the fact that he was in federal custody in March 1972 for arraignment, on July 14, 1972, for Mrs. Noyes' deposition, and presumably on May 5, 1972, when he was in court for disposition of pre-trial motions. The return on the May 5 writ does not indicate whether defendant was escorted to the courtroom by state or federal officials. On each of these occasions, he was returned to state custody without being tried, and each occasion was more than 120 days before trial. Article IV(c) permits continuances beyond the 120-day limit for good cause shown, and defendant has not successfully attacked Judge McLaren's granting of continuances. But there are no exceptions to the requirement that defendant not be returned to state custody untried. However, each federal custody was before

any detainer was filed, so that the Agreement is inapplicable.

Accordingly, we need not decide whether the Agreement is exclusive when it applies. We only note that it appears that the United States Attorney never intended to make a request under the Agreement in 1972; he wanted custody of defendant for short periods for particular purposes, but it clearly was not contemplated in March, May or July 1972 that defendant would be held in federal custody until tried.

*The Noyes Deposition*

The Government took the deposition of Mrs. Noyes pursuant to 18 U.S.C. § 3503. The transcript was read into the record after proof that Mrs. Noyes was too ill to come to Chicago for the trial. Defendant has made a broad-ranging attack on the admissibility of this deposition.

■ Mrs. Noyes testified that the jewelry stolen was worth $200,000. However, on cross-examination she admitted that the values to which she testified were set by her insurer and not by her. Defendant argues that even if she had testified in open court, this admission would make her testimony inadmissible hearsay. We disagree, for her testimony was not based on any idle expression of opinion by an insurance agent. Rather, it was based on an actual transaction: the amount the insurer paid for her jewelry. See III Wigmore on Evidence, § 719 (Chadbourn Rev.1970). Of course, the transaction was not between a willing buyer and a willing seller, so that it might be argued that the insurer's conduct in paying for the jewelry is offered as evidence of its belief as to market value and is therefore an implied hearsay assertion. The trend of modern rules and decisions is to admit assertive conduct as outside the hearsay rule. McCormick on Evidence, § 250 (2d ed. 1972). We agree with this trend and hold that an insurance loss payment is admissible to prove market value of stolen goods. Even if the insurance value were hearsay, it would

be admissible as a declaration against interest, since the insurer's valuation was forty times the value defendant argues was not proven, and $10,000 more than Mrs. Noyes originally claimed.

■ Admitting the deposition did not violate defendant's right to confrontation. In California v. Green, 399 U.S. 149, 165, 90 S.Ct. 1930, 26 L.Ed.2d 489, the Supreme Court said that previous testimony taken under circumstances approximating trial is admissible where the witness is unavailable despite good faith efforts of the Government to produce her. That statement controls here. Mrs. Noyes was under oath and Ricketson's counsel was given full opportunity to cross-examine her. This opportunity came after notice that the deposition was being taken for use at trial —an advantage Green's counsel did not have in California v. Green. The defendant was present at the deposition to assist his counsel. The passage from *Green* on which we rely is at best an alternative holding; it has been labeled dicta, and it has been criticized. See 8 Moore's Fed.Prac. ¶ 15.02 (2d ed. 1973 Supp.); United States v. Singleton, 460 F.2d 1148, 1155–1157 (2d Cir. 1972, Oakes, J. dissenting). But it is not an off-hand comment buried in a footnote; it is a separate subdivision of a majority opinion, and we are not at liberty to depart from it. That the Supreme Court considers the passage correct is emphasized by its recent promulgation of amendments to Federal Rule of Criminal Procedure 15, authorizing for all defendants the deposition procedure followed here. 42 LW 4554. We agree with the *Singleton* majority that the issue is settled. 460 F.2d at 1152–1153.

■ Defendant raises several contentions related to the statutory requirement that before the Government may use a deposition, the Attorney General's designee must certify that the prosecution "is against a person who is believed to have participated in an organized criminal activity." 18 U.S.C. § 3503(a). The Supreme Court's amendments to Rule 15 will probably render these contentions moot, but the amendments are not yet in effect, and we must decide the case under present law. Defendant argues that he has been continuously imprisoned since the effective date of Section 3503, so that if the Assistant Attorney General's certification refers to him, it must rely on organized criminal activity which pre-dates the Act, and thereby gives the Act an *ex post facto* effect. Since the deposition was admissible against defendants believed to have participated in organized criminal activity because they were more dangerous or harder to convict, and not to impose additional punishment for pre-Act crimes, there was no violation of the *ex post facto* clause. See Hawker v. New York, 170 U.S. 189, 196, 18 S.Ct. 573, 42 L.Ed. 1002. For similar reasons, Section 3503 is not a bill of attainder. Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 319–323, 18 L.Ed. 356. Although United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484, substantially expanded past notions of what is punishment for bill of attainder purposes, we see no way that this change in the rules of evidence can be considered punishment. Cf. Hopt v. Utah, 110 U.S. 574, 587–590, 4 S.Ct. 202, 28 L.Ed. 262.

■ Defendant also argues that there is no evidentiary support for the certification that he has participated in organized criminal activity. We agree with *Singleton,* 460 F.2d at 1154, that such certifications are not judicially reviewable absent a showing of bad faith. The statutory requirement is not that defendant actually have participated in organized crime; it is only that the Attorney General or his designee believe that he has so participated. Defendant has not contended that the Assistant Attorney General did not actually believe what he certified.

■ The deposition statute does not infringe defendant's freedom of association, as claimed. The statute is based on his personal participation in organ-

ized criminal activity, not mere association with organized criminals.

Finally, defendant argues that he has been denied equal protection as embodied in the Fifth Amendment's due process clause. The Supreme Court's decisions create some difficulty in determining the appropriate standard of review. This classification "touches on" the right to confrontation, a fundamental right. Shapiro v. Thompson, 394 U.S. 618, 638, 89 S.Ct. 1322, 22 L.Ed.2d 600. As Justice Harlan pointed out in dissent, if the fundamental constitutional right were itself violated, there would be no need to reach the equal protection issue, so that the majority, he reasoned, must have meant that strict scrutiny applies when, as here, the fundamental right is affected but not violated. 394 U.S. at 661–662. However, that conclusion is undercut by Johnson v. Robinson, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389, 42 LW 4313, 4317, n. 14, which stated without explanation that strict scrutiny did not apply in that case because the fundamental right involved was not violated. As to the other criterion, being believed to have participated in organized criminal activity is plainly an unsuspect category. Considering both factors, we conclude that this classification should be upheld if it has a rational basis.

■ The House Judiciary Committee found that the need for Section 3503 was "most acute in cases involving organized criminal activity * * *." House Rep. No. 91–1549 (1970 U.S.Code Cong. & Admin.News, pp. 4007, 4025). Representative McCulloch explained on the floor that "organized criminals have no motive to kill or kidnap a witness if the damning testimony is recorded and admissible." 116 Cong.Rec. 35197 (1970). See also remarks of Representative Poff at 35200. Congress could have concluded that organized criminals were more likely to intimidate witnesses, and that the longer the taking of testimony was delayed, the greater the opportunity for intimidation. This would be a rational basis for the statute, though not for its application here where the witness was ill but not alleged to be threatened. We are left with the mere fact that Congress considered organized crime to be a particularly dangerous and hard to prosecute form of crime, requiring extreme prosecutorial measures. Since persons who have voluntarily participated in organized illegal activity are such a peculiarly unsuspect category, we find this a sufficient rational basis for the classification. Accordingly, there is no denial of equal protection.

### Jurisdictional Amount

■ Defendant's contention that the jurisdictional amount was not proven is largely dependent on his contention that Mrs. Noyes' deposition was inadmissible. Her testimony was of course sufficient. Hohimer's testimony as to what he was paid on the "thieves' market" was also sufficient. United States v. Ditata, 469 F.2d 1270, 1272 (7th Cir. 1972).

### Admissibility of Burglary Tools as Weapons

■ Defendant next argues that the trial court improperly admitted into evidence certain handguns and burglary tools. Hohimer testified that these items were for use in the commission of this burglary. His testimony was partially corroborated by codefendant Green. Although defendant was not charged with burglary, the burglary was a key overt act in the conspiracy charge. The exhibits were taken to the Noyes' home to be used if needed. Since the exhibits were for use in the conspiracy, their probative effect outweighed their prejudicial effect. Cf. United States v. Stone, 471 F.2d 170, 172 (7th Cir. 1972). Because these exhibits were identified by Hohimer as the actual objects about which he testified, the Government was not required to establish their chain of custody. United States v. Blue, 440 F.2d 300, 303 (7th Cir. 1971), certiorari denied, 404 U.S. 836, 92 S.Ct. 123, 30 L.Ed.2d 68.

## 376

### Admissibility of Aerial Photographs

■ Although the defendant's principal brief complains of the admission of two large aerial photographs of the burglarized Noyes home and grounds, the reply brief has apparently abandoned the point. Defendant did not object to their admissibility when they were finally admitted after the local sheriff identified them, so that we need not consider the matter. In any event, Hohimer and Sheriff Stout sufficiently authenticated the photographs. They were relevant to corroborate and explain the testimony about the burglary and the difficult access to the residence.

For the foregoing reasons, the judgment is affirmed.