**UNITED STATES of America ex rel. Frank ESOLA, # 53517, Appellant,**

v.

**Ronald M. GROOMES, Superintendent.**

**No. 74–2197.**

United States Court of Appeals, Third Circuit.

Argued May 1, 1975.

Decided Aug. 5, 1975.

David M. Botwinick, and Eric J. Ludwig, Stark & Stark, Trenton, N. J., for appellant.

James M. Coleman, Jr., Monmouth County Prosecutor, and Charles E. Shaw, III, Edward A. MacDuffie, Jr., Assistant County Prosecutors, Freehold, N. J., for appellee.

Before FORMAN, VAN DUSEN and GARTH, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This appeal challenges the district court order filed August 5, 1974, which dismissed plaintiff's habeas corpus petition. We disagree with the lower court's holding that no cause of action is

presented by this claim arising under the Interstate Agreement on Detainers [1] and therefore vacate and remand for further proceedings.

On June 25, 1974, Frank Esola filed a petition for a writ of habeas corpus in the U.S. District Court for the District of New Jersey and alleged the following facts. On June 23, 1970, plaintiff was indicted by a Monmouth County, New Jersey, grand jury for possession of a stolen motor vehicle and possession of stolen property. On July 6, 1970, he was arraigned, entered a plea of not guilty, and was released on $5,000 bail. On March 15, 1971, petitioner received a four year sentence from the U.S. District Court for the District of New Jersey on an unrelated charge and began service of the federal sentence.

On April 21, 1971, Esola was transferred via a writ of habeas corpus ad prosequendum [2] from the Federal Correctional Institution at Danbury, Connecticut to Monmouth County, New Jersey, to stand trial. On April 27, 1971, he was returned to Danbury without having been tried. Thereafter, by unspecified procedures, Esola was returned to Monmouth County on June 10, 1971, September 25, 1971, and January 6, 1972 for trial.

During the January transfer he was tried and convicted. [3]

It was further alleged that petitioner, following his return to Danbury after his first transfer to New Jersey, requested the Danbury authorities not to allow any future transfers because of a violation of the Interstate Agreement on Detainers. The request was refused.

On November 15, 1971, appellant filed a pro se motion in the state trial court to dismiss the indictment based on a violation of Article IV(e) of the Interstate Agreement on Detainers (hereinafter Agreement). The motion was renewed during trial and denied in an order dated February 18, 1972. On July 6, 1973, the New Jersey Superior Court, Appellate Division, affirmed the conviction, specifically rejecting the claim relating to a violation of the Agreement. On November 27, 1973, the New Jersey Supreme Court denied certification. Neither the trial court nor the Appellate Division set forth reasons for denying petitioner's claim.

State remedies having been exhausted, the instant habeas corpus proceeding was initiated. Petitioner contended that he was entitled to have the state conviction voided because New Jersey violated Article IV(e) of the Agreement, N.J.S.A. 2A:159A–4(e),[4] when he was returned to

---

1. Thirty-seven states have adopted the Interstate Agreement on Detainers. The United States and the District of Columbia entered into the Agreement in 1970, Act of Dec. 9, 1970, Pub.L.No.91–538, §§ 1–8, 84 Stat. 1397, 18 U.S.C.A. App. p. 167 (1975 Supp.). *See Grant v. Hogan*, 505 F.2d 1220, 1221 n.1 (3d Cir. 1974).

2. The petition contains this allegation in paragraph 12(a) at page 3:

    "On April 21, 1971, while incarcerated at the Federal Correctional Institution at Danbury, Connecticut (hereinafter referred to as Danbury), petitioner, pursuant to a writ of habeas corpus Ad Prosequendum, secured by the Monmouth County Prosecutor, was transported to Monmouth County, New Jersey for trial on the aforementioned indictment."

    As explained below, this writ constituted a detainer under the terms of the Agreement.

    Also, Esola alleged that New Jersey wanted to prosecute him for a violation of N.J.S.A. 2A:139–1.

3. Appellant's brief filed in this Court states that there was a fifth transfer to New Jersey for the purpose of sentencing. The state records appended to the habeas corpus petition show that the sentencing occurred approximately one month after the trial but do not reflect whether a separate transfer was effected for this purpose. Since the case is being remanded, plaintiff will have an opportunity to file a Motion to Amend his Petition in the District Court if he so desires.

    The petition names Ronald N. Groomes as the respondent. Esola has apparently been transferred to another institution in New Jersey. After remand, a Motion to Amend the Caption to reflect the new custodian should be entertained. *United States ex rel. Jennings v. Pennsylvania*, 429 F.2d 522, 523 (3d Cir. 1970).

4. Article IV(e) of the Agreement, N.J.S.A. 2A:159A–4(e) provides:

    "If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the

Danbury without having been brought to trial. In answer to the petition the Monmouth County Prosecutor denied all of the factual allegations. The only state records which are part of the record before this Court are the documents which were attached to the habeas petition.

The district court held that state remedies had been exhausted as required by 28 U.S.C. § 2254(b) but dismissed the petition, citing *United States ex rel. Huntt v. Russell*, 285 F.Supp. 765 (E.D. Pa.1968), *aff'd.* 406 F.2d 774 (3d Cir. 1969). *Huntt* involved a claim that an illegal extradition rendered a subsequent conviction void. Based on a long line of Supreme Court cases [5] rejecting this contention, relief was denied. *Huntt* does not control this case, however, because there was no assertion in that case that the rendition was violative of the Interstate Agreement on Detainers.

Although the opinion of the court below did not state the procedural basis upon which the petition was dismissed, the record is clear that the court treated the respondent's answer as a motion to dismiss for failure to state a claim upon which relief could be granted, Fed.R. Civ.P. 12(b)(6), *United States ex rel. Gaugler v. Brierley*, 477 F.2d 516, 523 (3d Cir. 1973), and granted the motion. This Court's function is to determine whether, assuming all of the facts alleged in the petition to be true, the petition states a claim upon which relief can be granted. 2A Moore's Federal Practice ¶ 12.08.[6]

The Interstate Agreement on Detainers is a comprehensive statute which is designed to handle two major problems facing a prisoner against whom a detainer representing open criminal charges in another jurisdiction has been lodged. Article I of the Agreement [7] states that the party jurisdictions recognize that detainers and the difficulty in securing rapid disposition of them "produce uncertainties which obstruct programs of prisoner treatment and rehabilitation." To implement the right to a speedy trial and to minimize the interference with a prisoner's treatment and rehabilitation, the Agreement creates several rights previously non-existent.

Article III of the Agreement [8] gives to a prisoner the right to demand disposition of any untried indictment, information or complaint which is the subject of a detainer lodged by a party state. If the trial is not commenced within 180 days of the request and a continuance is not granted in open court, for good cause shown, with the prisoner or his counsel present,[9] then the appropriate court in the jurisdiction in which the

---

original place of imprisonment pursuant to Article V(e) hereof, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."
The companion federal provision, 18 U.S.C. Appendix (1975 Supp.) Article IV(e), is identical.

5. *See, e. g., Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886).

6. Rule 81(a)(2), Fed.R.Civ.P., provides that the Federal Rules of Civil Procedure apply to habeas corpus proceedings except to the extent that the procedure is modified by statute.

7. Article I of the Agreement provides:
"The party States find that charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly it is the policy of the party States and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints. The party States also find that proceedings with reference to such charges and detainers, while emanating from another jurisdiction, cannot properly be had in the absence of cooperative procedures. It is the further purpose of this agreement to provide such cooperative procedures."

8. N.J.S.A. 2A:159A–3. The federal provision is identical.

9. N.J.S.A. 2A:159A–3(a). The federal provision is identical.

outstanding charge is pending shall enter an order dismissing the criminal charges with prejudice.[10] Thus, Article III is concerned with providing a mechanism, capable of being invoked by a prisoner, to insure the constitutional guarantee of a speedy trial.[11]

Article IV, on the other hand, is designed both to provide a simplified procedure for allowing the demanding state to gain the presence of the defendant for trial, and to control what happens to the prisoner following rendition to the demanding jurisdiction. Article IV(a)[12] states that absent affirmative intervention by the governor of the confining jurisdiction,[13] and after a 30 day waiting period, a request for temporary custody by the prosecutor which is approved, recorded and transmitted by the court having jurisdiction over the pending charge shall be honored by the sending state. Article IV(c) requires that any trial made possible by the use of the Article IV(a) right shall be commenced within 120 days unless a continuance for good cause is granted in open court, the prisoner or his counsel being present. Finally, Article IV(e)[14] provides that if the trial is not held prior to the prisoner's return to the sending state, then the "indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." The

purpose of the Article IV provisions is to insure that interruptions of the sending jurisdiction's incarceration are minimized, and in exchange for the small added hardship placed on the prosecutor of the demanding state regarding time limits, a simplified procedure for obtaining the defendant's presence is made available.

With this basic statutory framework in mind, we turn to the issues presented by this appeal.

## I. JURISDICTION

Title 28 U.S.C. § 2254(a) provides in part that an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment shall be entertained "only on the ground that he is in custody in violation of the . . . laws . . . of the United States." Appellant Frank Esola's claim is that he is in custody in violation of Article IV(e) of the Interstate Agreement on Detainers, N.J.S.A. 2A:159A–4(e). At oral argument before this Court, counsel for appellee conceded that a claim arising under the New Jersey enactment of the agreement presented a claim under the laws of the United States.[15] Because this requirement goes to the jurisdiction of a federal court to grant habeas corpus relief, some discussion is warranted.[16]

Congress provided in section 2 of P.L. 91–538:

---

**10.** N.J.S.A. 2A:159A–5(c). The federal provision is identical.

**11.** In *Smith v. Hooey*, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), decided the year before federal enactment of the Agreement, the Court held that the constitutional right to a speedy trial was not suspended because the state did not have the power to compel the presence at trial of a defendant who was a prisoner in another jurisdiction. There is some indication that the *Smith* decision spurred the adoption of the Agreement by Congress. S.Rep.No.91–1356, 91st Cong., 2d Sess. (1970) 3 U.S.Code Cong. & Admin.News, p. 4864 (1970).

**12.** N.J.S.A. 2A:159A–4(a). The federal provision is identical.

**13.** As the Agreement applies to the United States, "governor" is defined as the Attorney

General. 18 U.S.C. Appendix (1975 Supp.) § 3.

**14.** N.J.S.A. 2A:159A–4(e). The federal provision is identical.

**15.** This concession at oral argument constituted a change in position by the appellee. No explanation of this shift was offered. In a supplemental memorandum, submitted, prior to the argument, at the request of the Court, appellee had taken the position that Esola's claim did not arise under the laws of the United States.

**16.** A federal court is always required to examine its own jurisdiction. Fed.R.Civ.P. 12(h)(2); *Mansfield, Coldwater & Lake Michigan Ry. v. Swan*, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884).

"The Interstate Agreement on Detainers is hereby enacted into law and entered into by the United States on its own behalf and on behalf of the District of Columbia with all jurisdictions legally joining in substantially the following form: . . .."

(18 U.S.C. Appendix (1975 Supp.)).[17]

■ The habeas petition alleges that Esola, while an inmate of the Federal Correctional Institution at Danbury, was transferred to Freehold, New Jersey, on several occasions. As a federal prisoner, the transfer could have been accomplished through the use of the Agreement. This was possible *only* because both the sending jurisdiction, the United States, and the demanding state, New Jersey, were both parties to the agreement. If the machinery created by the Agreement had been used, then N.J.S.A. 2A:159A–4(a) would have entitled the Monmouth County Prosecutor to temporary custody of the prisoner for the purpose of standing trial. In order to make this New Jersey entitlement effective, 18 U.S.C. Appendix (1975 Supp.) Article IV(b) and Article V(a) would have required the warden at Danbury to honor the request. It is clear that the statutes of each jurisdiction are relevant and necessary to accomplish the transfer.

The Agreement, in addition to being a statute of the typical variety which provides rights and imposes duties, is binding in this case on New Jersey as well as the United States. Thus, while Esola's rights to a speedy trial and effective rehabilitative treatment were allegedly violated by the multiple transfers, the rights of the United States were also violated by the same transfers. The Federal Government, through joinder in the Agreement, forfeited its right to exclusive control over Esola during the term of the sentence imposed by the district court. Concomitantly, the United States gained the right not to have its various rehabilitative programs unduly hampered by numerous, unnecessary transfers to a jurisdiction with outstanding criminal charges. In short, the Agreement cannot be viewed as a single enactment by a single legislative body. Rather it is a law binding on at least two sovereigns as far as this case is concerned. Rights arising under the Agreement flow from the joint actions of both of the party jurisdictions. A right claimed under the New Jersey statute, to the extent the right is actually found to exist, is therefore also claimed under the United States statute. A claim arising under a statute of the United States, specifically P.L. 91–538, is a claim arising under the "laws . . . of the United States" within the meaning of 28 U.S.C. § 2254.

■ We therefore hold that a claim, by a prisoner in federal custody at the time the Detainers Agreement is invoked, arising under N.J.S.A. 2A:159A–1 *et seq.,* as it operates in conjunction with the federal enactment of the Agreement, 18 U.S.C. Appendix (1975 Supp.), is a claim arising under the "laws . . . of the United States," within the meaning of 28 U.S.C. § 2254.

Congress was not consenting to a compact between states under Article I, Section 10, Clause 3, of the Constitution in P.L. 91–538, since consent had been previously given in advance by 44 Stat. 909 (1934), reproduced at 4 U.S.C. § 112(a). Congress recognized in the legislative history of P.L. 91–538 that its consent to the Agreement as a compact had already been given. See 3 U.S.Code Cong. & Admin.News, 91st Cong., 2d Sess. 1970, at p. 4866. For this reason, we need not determine the question of whether a claim arising under a compact only consented to by Congress under Article I, Section 10, Clause 3, is necessarily a claim arising under the laws of the United States. *Cf. League to Save Lake Tahoe v. Tahoe Regional Planning Agency,*

---

17. It would appear significant that Congress, by enacting P.L. 91–538, subjected itself to the transfer of federal prisoners, including those held for criminal offenses committed in the District of Columbia, to other states which were *parties to the Agreement* in accordance with its terms.

507 F.2d 517 (9th Cir. 1974), *cert. denied*, 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654 (1975); Engdahl, *Construction of Interstate Compacts: A Questionable Federal Question,* 51 Va.L.Rev. 987 (1965).

## II. THE MERITS AS ALLEGED IN THE PETITION

As noted above at page 4, no hearing was held and the district court dismissed the claim, treating the answer as a motion to dismiss under F.R.Civ.P. 12(b)(6). Under these circumstances, our discussion of the merits must treat the allegations in the petition as true, since petitioner was given no hearing, trial or other opportunity to prove his allegations. We express no opinion whatever on the legal result which the district court should reach on remand when it has a more complete record, but consider it necessary to comment on the contentions made by respondent on this appeal for the assistance of the district court and counsel on remand in view of our disagreement with several of such contentions, particularly in light of the legislative history of P.L. 91–538 as applied to this record.

Esola argues that, since he was transferred from Danbury to Freehold, New Jersey, and returned to Danbury without having been tried, Article IV(e) requires a dismissal of the indictment for which he is now serving a custodial sentence. Article IV(e), N.J.S.A. 2A:159A–4(e), provides:

"If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to Article V(e) hereof, such indictment, information or complaint shall not be of any further

force or effect, and the court shall enter an order dismissing the same with prejudice."

In order to rebut the Article IV(e) claim, the appellee offered two arguments in its brief filed in this Court and a third contention was raised at oral argument.

First, the appellee contends that the five transfers in this case were pursuant to writs of habeas corpus ad prosequendum issued by a state court and honored as a matter of comity, by the Federal Bureau of Prisons.[18] Since the request was not made pursuant to Article IV of the Agreement, it is argued that the remedial provisions could not be relevant. Further, the State at oral argument took the position that the Agreement could not have been used in this case because, following arraignment on the state charges and prior to his sentencing by the district court, Esola was released on bail.[19] Since he was on bail, no detainer was or could have been lodged by the state with the federal prison. We think both of these arguments must fail on these allegations because they misconceive the broad nature of the Agreement and misconstrue the meaning of "detainer" as that word is used in the Agreement.

■ It has been held that the Interstate Agreement on Detainers, because it "is obviously remedial in character[,] . . . should be construed liberally in favor of [those whose problems were sought to be alleviated.]" *State v. West,* 79 N.J.Super. 379, 384, 191 A.2d 758, 760 (App.Div.1966); *People v. Esposito,* 37 Misc.2d 386, 201 N.Y.S.2d 83, 88 (1960).[20] Those whose problems are addressed in the Agreement are prisoners with outstanding criminal charges from another jurisdiction. The purpose of the provi-

---

18. It is the policy of the Bureau of Prisons to honor state court writs of habeas corpus ad prosequendum absent some exceptional circumstances Bureau of Prisons Policy Statement No. 7500. 14A(i). *See also Smith v. Hooey,* 393 U.S. at 381, n.13, 89 S.Ct. 575.

19. This factual assertion is consistent with the allegations contained in the habeas petition.

20. This canon of statutory construction is repeated in the Agreement itself. Article IX, N.J.S.A. 2A:159A–9, provides in pertinent part: "This agreement shall be liberally construed so as to effectuate its purposes." The purposes of the statute are contained in Article I, set forth at note 7, *supra.*

sion which this case brings into issue is to minimize the adverse impact of a foreign prosecution on rehabilitative programs of the confining jurisdiction. When a prisoner is needlessly shuttled between two jurisdictions, then any meaningful participation in an ongoing treatment program is effectively foreclosed for two reasons. First, participation requires physical presence and the continuous physical presence of a prisoner is not possible when multiple trips to a foreign jurisdiction are made. Secondly, the psychological strain resulting from uncertainty about any future sentence decreases an inmate's desire to take advantage of institutional opportunities.[21]

These problems are well documented in the instant case. At least since April 21, 1971, the date of the first return to New Jersey, Frank Esola was aware that the New Jersey authorities fully intended to prosecute him on the 1970 indictment. Yet it was not until February 18, 1972, nearly 10 months later, that final sentence was pronounced. Between April 1971 and February 1972 there were five interruptions of the Danbury incarceration. It is precisely this type of situation which the Agreement was designed to eliminate. Were we to hold, as New Jersey urges, that the machinery of the Agreement is not the ex-

clusive means of effecting a transfer for the purpose of prosecution on these allegations, then Article IV(c), requiring prosecution within 120 days of arrival, and Article IV(e), allowing for only one rendition, would be meaningless. As one court cogently noted in construing a different section of the Agreement, "By that view, this law has wax teeth and is little more than a legislative exercise in futility." *People v. Esposito, supra,* 201 N.Y.S.2d at 88.

■ Our holding that the Agreement provides the exclusive means of transfer when it is available was foreshadowed by and is fully consistent with the recent case of *Grant v. Hogan,* 505 F.2d 1220 (3d Cir. 1974). Grant, a federal prisoner, brought suit in a federal court seeking an order directing that the federal warden "hold for naught" a detainer representing an untried indictment which had been lodged by a state. The basis for the attack was a claimed denial of a speedy trial. This Court held that absent unusual circumstances an attack on a detainer must be preceded by a demand for trial pursuant to Article III of the Agreement. In so holding we impliedly recognized that this exhaustion requirement would solve most of the speedy trial problems ensuing from multiple prosecutions.[22] Our holding today

21. Article I of the Agreement, N.J.S.A. 2A:159A–1, is explicit regarding the purposes of the Agreement. See note 7, *supra. See also,* S.Rep.No.91–1356, *supra* note 11, p. at 4866. Congressman Poff described the purposes of the Agreement as follows (116 Cong. Rec. 14000, May 4, 1970):

"The agreement on detainers does not affect the applicable law in any criminal case. All it does is insure that both prosecution and defendant may, if they desire, obtain their day in court on a prompt and timely basis. The advantages to both sides are considerable.

From the prosecutor's point of view, a long delay in trial pending release of a prisoner by another State might make conviction impossible. Witnesses might die or disappear or become unavailable.

To the defendant, such a delay would effectively deny him a speedy trial. The Supreme Court held in *Smith v. Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607

(1969), that the speedy trial clause of the sixth amendment requires that a State which has a charge pending against a defendant serving a sentence elsewhere make a good faith effort to bring such defendant to trial within a reasonable time.

On a more practical level, an outstanding detainer may make a defendant ineligible for probation or parole or for some of the more desirable work assignments in prison. Also, if a defendant is uncertain as to whether he will have to serve another jail term he is less likely to have the motivation to become successfully rehabilitated. This latter consideration is especially important in view of the fact that the basic purpose of the entire penal system is to prepare its inmates to reenter society as law-abiding citizens." *See also* 116 Cong.Rec. at 13999.

22. 505 F.2d at 1224. This requirement of exhaustion of remedies under the Agreement prior to seeking relief from a detainer on speedy

is merely the other side of the same coin: the state is also required to use the statute if it is available.[23]

■ New Jersey next claims that it could not have used the Agreement in this case because Esola had previously been released on bail on the outstanding indictment and therefore the warden at Danbury could not have been requested to "detain" Esola following his release on the federal sentence. This argument must be rejected because its premise, that a detainer is a hold order, is incorrect.

The word "detainer," as it is used in the Agreement, is "a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." See Senate Report 91–1356, 91st Cong., 2nd Sess., 3 U.S.Code Cong. & Admin.News, p. 4865. This definition of a detainer from the Senate Report finds support in the other legislative history of the Agreement and is consistent with the purposes of the Agreement.

Although the legislative history of the federal enactment of the Agreement is not voluminous, perhaps because there was apparently no opposition to it in either the House of Representatives or Senate, the remarks of Representative Kastenmeier upon introduction of the bill make clear that he considered a detainer to be simply a notice filed with the confining institution that criminal charges from another jurisdiction were outstanding and that the prisoner was wanted in order to stand trial on those charges. 116 Cong.Rec. 13999 (remarks of Rep. Kastenmeier).[24] The Committee Reports of both the House Judiciary Committee and the Senate Judiciary Committee follow Rep. Kastenmeier's language almost verbatim.[25] See generally, Lawrence v. Blackwell, 298 F.Supp. 708, 711 n.1 (N.D.Ga.1969); United States v. Candelaria, 131 F.Supp. 797, 805 (S.D.Cal.1955), quoting Handbook on Interstate Crime Control, Chapter V.

Further, the definition of detainer described above is commensurate with the purposes of the Agreement. The uncertainty resulting from pending criminal charges is no less in a situation where the demanding state has requested that the confining state hold the prisoner following expiration of the maximum term than the uncertainty created by a request to be notified of the impending release date. We note that, to the extent that the detainer represents an untried criminal charge, it appears that the policy of the United States Bureau of Prisons is to require the demanding jurisdiction to initiate separate extradition proceedings where the request for custody comes at the end of the federal prison term and the prisoner does not waive extradition. Bureau of Prisons Policy Statement No. 7500.14A(a), (b) and (d).[26]

trial grounds is the subject of a standing order in the District of Kansas, Fells v. Kansas, 343 F.Supp. 678, 680 (D.Kan.1972), and also appears to be in line with the view of the Eighth Circuit. See Wingo v. Ciccone, 507 F.2d 354 (8th Cir. 1974); Cooper v. Lockhart, 489 F.2d 308 (8th Cir. 1973). Cf. Waddell v. Alldredge, 480 F.2d 1078 (3d Cir. 1973); Willis v. Ciccone, 506 F.2d 1011, 1015 (8th Cir. 1974).

23. Insofar as United States v. Ricketson, 498 F.2d 367 (7th Cir. 1974), is inconsistent with this decision, we decline to follow it on the facts of this case.

24. Rep. Kastenmeier stated: "For the purpose of this legislation of a detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to stand trial on pending criminal charges in another jurisdiction." 116 Cong.Rec. 13999 (May 4, 1970).

25. S.Rep.No.91–1356, supra note 11, p. at 4865. The Report of the House Judiciary Committee is identical. H.R.Rep.No.91–1018, 91st Cong. 2d Sess. (1970).

26. Policy Statement 7500.14A states that warrants based on pending charges will be treated as detainers, id. § (a). It further provides that notice will be given to the detaining authorities 60 days prior to release and advises that the detaining authority should make arrangements with local authorities in the state where the institution is located to take custody at the appropriate time, id. § (b). Section (d) states that if the prisoner does not sign a waiver of extradition then "the detaining authorities should be notified immediately in order that

■ In light of the fact that a detainer is only a document indicating that there are pending criminal charges and a request to be notified of the impending release date, the state's argument that New Jersey had no right to file a detainer and thereby invoke the simplified transfer procedures of the Agreement must be rejected.

New Jersey further contends that Article IV(e) of the Agreement, N.J.S.A. 2A:159A–4(e), was not violated by Esola's return to Danbury without having been tried because the various continuances which were granted were for good cause.

■ As respondent recognizes, the Agreement must be read in its entirety in order to determine its correct meaning. Article IV of the Agreement sets forth the formal requirements for transfer to a demanding jurisdiction. Article IV also minimizes the interference which results from the transfer. Thus Article IV(c) provides that the trial must begin within 120 days after the prisoner's arrival in the demanding state unless a continuance is granted for good cause shown, in open court, the prisoner or his counsel being present. For good cause shown, therefore, a continuance beyond the 120 day limit of Article IV(c) is available. This record does not show that a continuance was granted for good cause shown in open court.[27]

Under these allegations, the indictment would be subject to dismissal with prejudice under Article IV(e) if the trial is not held prior to the relator's return to the sending jurisdiction. See *United States v. Ricketson,* 498 F.2d 367, 373 (7th Cir. 1974) (dicta). We have considered and rejected other contentions of the respondent.[28]

■ We emphasize that we decide no more in this case than that a cause of action is stated by the apparent failure of New Jersey to comply with the terms of the Agreement, and hence that further proceedings in the district court are required. As was noted earlier in this opinion,[29] there is a very incomplete record before this Court, the state records not having been filed and the appellee having filed as an answer to the petition only a general denial of Esola's factual allegations. It is, therefore, necessary to remand this case to the District Court for the development of a full record. From the briefs filed in this Court and from the representations made at oral argument by counsel for appellee, there may be no dispute with regard to facts which were alleged in the habeas petition. Since we have determined that, under the facts alleged and because the relator is confined, appellant would be entitled to issuance of the writ of habeas corpus, the District Court should consider this case on a proper record at its earliest opportunity.

The judgment of the District Court will be vacated and the case remanded for further proceedings consistent with this opinion. Costs taxed against the appellee.

---

they may make their decisions with regard to the question of extradition," *id.* § (d).

27. Respondent made no such allegation in its answer and implied at page 7 of its brief that no such continuance was granted. For this reason, we need not meet, on this record, the contention of respondent that Article IV(e) of the Agreement is modified by Article IV(c).

28. New Jersey argues further that since it is liable for the costs of pretrial incarceration under Article V(h), it would be unduly harsh to force them to bear the expense of incarceration which, they assert, was necessarily very long in this case. The response to this is that the scheme of the Agreement, to expedite the disposition of the detainers, adds cost as one additional factor to encourage careful planning and discourage the use of the Article IV(c) continuance. Finally, the state asserts that the federal authorities at Danbury might have been reluctant to agree to the extended temporary custody which is involved in this case. The answer to this question is that had a proper Article IV(a) request for temporary custody been made, absent intervention by the executive, Article V(a) would have entitled New Jersey to such custody. The potential reluctance of the Danbury authorities is no bar to the imposition of Article IV(e) sanctions.

29. See note 6, *supra,* and accompanying text.

GARTH, Circuit Judge (concurring):

I agree with the majority of the Court that a federal question is presented by the petition for habeas corpus and that the case must be remanded for further proceedings. Nevertheless, I believe it important to note my disagreement with the majority's jurisdictional analysis (Part I of the Majority Opinion) which holds that the petition suffices as a claim alleging state "custody in violation of the . . . laws . . . of the United States." 28 U.S.C. § 2254(a); Majority Opinion at 834–836.

I read the majority's theory of jurisdiction as stating: that on the date (December 9, 1970) that the United States' enactment of the Interstate Agreement on Detainers became effective for the United States (March 9, 1971), all statutes of those states which had previously enacted the Agreement by such statutes were immediately transformed into a law of the United States. *See* Majority Opinion at 834.

While the majority's analysis reaches the same result as the analysis set forth below under the particular facts present here, it neither specifies nor articulates the authority by which a state statute enacting the Agreement as a law of *that* state can suddenly become a law of the United States when the Agreement is enacted by the United States but "on its [the United States'] own behalf and on behalf of the District of Columbia . . . ." 18 U.S.C.A. Appendix § 2 (1975 Supp.).[1] Nor does the majority's analysis answer the question of whether a violation of the Agreement between two states, one of which is *not* the United States would give rise to federal habeas corpus jurisdiction.

The majority's analysis also fails to provide a jurisdictional basis for a claim arising out of a pre-1971 violation of the Agreement. This analytical failure is evident even if the violation occurred as between the United States and another party state let alone between two party states, one of which was *not* the United States.

Finally, the theory advanced by the majority does not explain which law governs in the interpretation and application of the Agreement in the courts of each of the party states.

It is true, of course, that we are presented here only with a violation which took place after March 9, 1971 and which involves only the United States and New Jersey. Hence, as a general rule of jurisprudence, it could be expected that the majority go no further than to decide whether the facts in this particular case give rise to jurisdiction. However, I believe that as jurisdiction is at issue, the majority's approach is too restricted. Instead, because federal jurisdiction is at issue, all possible circumstances that may arise should be considered to determine the validity and the soundness of the proposed jurisdictional theory.

In my view, a much sounder and appropriate jurisdictional basis is afforded by reference to the Compact Clause of the United States Constitution, Art. I, § 10, cl. 3. Accordingly I believe that the majority's jurisdictional analysis, while effective in resolving the issue in this case, is, at most, a secondary and less desirable jurisdictional basis for Esola and for future cases that may arise. After analyzing the possible theories by which federal habeas corpus jurisdiction

---

1. It would appear that the only tenable theory by which the majority could support its thesis is one of contract, inasmuch as the Agreement itself refers to "The *contracting states* solemnly agree that. . . ." 18 U.S.C.A. Appendix § 2 (1975 Supp.) (emphasis supplied). Moreover, § 2 by its terms appears in a contract context, i. e., "the Interstate Agreement. . . is hereby enacted into law and *entered into by* the United States . . . *with* all jurisdictions legally joining in [enactment of the Agreement] . . . ." *Id.* (emphasis supplied). Nothing, however, appears in the Majority Opinion to indicate that the federal law concept arises out of a contract by the United States with the other party states. If in fact that is the underlying and implicit authority of the Majority Opinion, I nevertheless am of the view that there are shortcomings to such a jurisdictional predicate, some of which are indicated in the text of this Concurring Opinion.

may lie in the context of the Agreement, I find the most appropriate to be a theory predicated upon congressional approval of Interstate Agreements or a "Compact Clause" analysis.

The Compact Clause requires congressional approval of agreements between the states. New Jersey's enactment of the Interstate Agreement on Detainers is an agreement between it and other states which have enacted the Agreement. As such, its approval by Congress under the Compact Clause is required. Such congressional approval for the states' agreement on detainers was provided in advance by the Act of June 5, 1934, 4 U.S.C. § 112(a). *See* 1970 U.S. Code Cong. & Ad.News at 4866.

It necessarily followed that upon approval by the United States Congress in 1934 (even though the United States did not itself become a party state under the Agreement until 1970),[2] federal law, rather than the particular law of each party state, governed, and is to govern, the interpretation of the Agreement.[3] *See Petty v. Tennessee-Missouri Bridge Comm'n,* 359 U.S. 275, 279–80, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959); *Interstate Wrecking Co., Inc. v. Palisades Interstate Park Comm'n,* 57 N.J. 342, 273 A.2d 10, 13–14 (1971). As such, the Agreement and its construction by judicial authorities, involves a *"federal* 'title, right, privilege, or immunity'. . ." *Delaware River Comm'n v. Colburn,* 310 U.S. 419, 427, 60 S.Ct. 1039, 1041, 84 L.Ed. 1287 (1940) (emphasis supplied); *see Engdahl, Construction of Interstate Compacts: A Questionable Federal Question,* 51 Va.L.Rev. 987 (1965). Accordingly, I believe that congressional consent to New Jersey's enactment of the Interstate Agreement under which Agreement federal rights were created, transformed New Jersey's enactment of the Agreement into a "law" of the Unit-

ed States. *League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 507 F.2d 517 (9th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed. 654 (1975). *See Pennsylvania v. The Wheeling & Belmont Bridge Co.,* 54 U.S. (13 How.) 518, 565, 14 L.Ed. 249 (1851). That federal law became binding on New Jersey *not* on March 9, 1971, the effective date of the United States' enactment of the Agreement, but rather on April 18, 1958, the effective date of New Jersey's enactment of the Agreement. In similar fashion this federal law is binding as to each party state as of the date on which that particular state entered into or joins the Agreement.

In *League to Save Lake Tahoe, supra,* the Ninth Circuit held that congressional sanction of an interstate agreement transformed it into a "law" of the United States for purposes of 28 U.S.C. § 1331(a) jurisdiction. I believe that a similar conclusion must be reached with respect to New Jersey's enactment of a congressionally approved agreement.

As earlier stated, under the majority's analysis certain significant questions concerning jurisdiction and its effects are unanswered. In contrast, under a "Compact Clause" analysis, the answers would appear to be evident. Under the "Compact Clause" analysis, it is immaterial whether the United States is one of the "transacting" jurisdictions. By virtue of the congressional action approving the Agreement, the Agreement as enacted by each state subsequent to 1934 is a "law" of the United States. As such, a violation of the Agreement is a violation of a law of the United States within the purview of 28 U.S.C. § 2254. Hence since 1934 and not 1971, habeas corpus jurisdiction in the federal courts should have been, and is, available for violations of the Agreement where neither the receiving party jurisdiction nor the sending

---

2. *See* 18 U.S.C.A. Appendix (1975 Supp.).

3. I recognize, as does the majority, that the enactment of the Agreement by each party state is undoubtedly in identical statutory terms. Nevertheless, the gloss which may be imparted by the courts to identical language

may vary significantly among the states which have separately enacted the Agreement. It is for this reason that I consider the need for a uniform interpretation of the Agreement to be significant, and indeed mandatory.

party jurisdiction was or is the United States.

I believe only the "Compact Clause" analysis provides the breadth of habeas corpus availability in federal courts and the concomitant uniformity of interpretation. Uniformity of interpretation is necessary as the Agreement deals with more than local concerns; indeed, the remedial provisions of the Agreement, by allowing relief only in the receiving jurisdiction, even for violations occurring in the sending jurisdiction, encompasses and affects activities beyond the control of a single state.[4] The majority's analysis seriously jeopardizes the attainment of such a uniform interpretation. The possibility exists under the majority's theory of jurisdiction, that the Agreement may be interpreted by the *same* receiving state under two, potentially different, standards of law: one being a federal standard (and then if at all, only after March 9, 1971), where the United States is the sending jurisdiction, thus giving a "federal" content to the Agreement, and the other being a state standard where the sending jurisdiction is a state, thus permitting the Agreement to be interpreted according to the law of one of the two states. In contrast to the majority's view, the "Compact Clause" analysis would require that the courts of the several jurisdictions (38 states plus the United States) which have enacted the Agreement interpret the Agreement according to a single standard—a federal one. *See* note 3, *supra*.

The majority and I have reached the same conclusion as to the petition before us, that is that habeas corpus jurisdiction is available in the federal courts. We part company, however, in the respective routes chosen to reach this conclusion. It would appear that the majority's route must either begin with the United States at one end of the prisoner's transfer or terminate with the United States at the other end. In my view, the majority's route is too narrow and limited as it may deny a federal forum for habeas corpus relief to petitioners with justifiable grievances arising out of actions by states where the United States is not a party. Certainly this would be so under the majority's theory where pre-1971 matters are in issue. I would hope that in time this Court will depart from the narrow one-lane route constructed by the majority to traverse the broader jurisdictional highway which I have outlined.

I am obliged, however, to make still another observation with respect to the Majority Opinion. The majority, by its own statement, has decided no more than ". . . that a cause of action is stated by the apparent failure of New Jersey to comply with the terms of the Agreement, and hence that further proceedings in the district court are required." Majority Opinion at 839. Indeed, it would be improvident for us to decide otherwise since by reason of the district court's dismissal of the petition, the record before us is silent. Taking the majority at its word, I thus disregard as gratuitous and advisory any discussion in the Majority Opinion which treats with any of the merits of the petition. The merits of Esola's petition, having been assumed to be true for purposes of appellate review,[5] we should

4. Although the courts of each jurisdiction which has enacted the Agreement are to interpret and apply their own respective statutes, it is only in the courts of the receiving party state (here New Jersey) that remedies are available for noncompliance with the Agreement. As the remedy provided by the Agreement for acts of noncompliance is dismissal of the indictment "with prejudice", it follows that any allegations that the Agreement has been violated are to be presented to and resolved by only the courts of the jurisdiction where the indictment is pending. *See* Interstate Agreement on Detainers, Art. V(c); 18 U.S.C.A. Appendix (1975 Supp.); N.J.S.A. 2A:159A–5(c). Thus, even though violation of the Agreement occurs in the sending jurisdiction, such as by failure of the warden to comply with Art. III(c) in notifying the prisoner of the detainer and of the prisoner's right to request a final disposition of the charges, the Agreement anticipates that relief lies only in the courts of the receiving jurisdiction. *People v. Esposito*, 37 Misc.2d 386, 201 N.Y.S.2d 83 (Cty.Ct.1960); *see State v. West*, 79 N.J.Super. 379, 191 A.2d 758 (App.Div.1963). *But see King v. State*, 5 Md.App. 652, 249 A.2d 468, 475 (1969) (No sanction provided for warden's failure to give prisoner required notice under an Intrastate Detainer Act containing language similar to the Interstate Agreement on Detainers).

5. *See* Majority Opinion at 833.

defer after remand to the district court for its resolution of all questions of fact and law, other than, of course, jurisdiction.