**William Louise THOMAS**

v.

**Edward H. LEVI, Attorney General of the United States, et al.**

**Civ. A. No. 76–2929.**

United States District Court,
E. D. Philadelphia.

Nov. 15, 1976.

---

Paul Yermish, Philadelphia, Pa., for plaintiff.

Alexander Ewing, Jr., Asst. U. S. Atty., Philadelphia, Pa., for defendants.

## OPINION

DITTER, District Judge.

This petition for a writ of habeas corpus presents a question involving the construc-

tion of the Federal Extradition Act[1] and the Interstate Agreement on Detainers Act.[2] For the reasons which follow, I conclude that the relief petitioner seeks must be denied.

William Louise Thomas is a federal prisoner whose temporary custody for the purpose of disposing of outstanding criminal charges is sought by the State of New Jersey. Thomas was indicted by a federal grand jury in this district for narcotics violations. After her arrest on the federal charges, Thomas surrendered[3] to state authorities in Philadelphia pursuant to a warrant based on a New Jersey indictment growing out of the same narcotics transactions which triggered the federal charges. She refused to waive extradition to New Jersey. A hearing pursuant to Pennsylvania's version of the Uniform Extradition Act,[4] 19 P.S. § 191.1 et seq., was scheduled for November 13, 1975, before a Philadelphia Municipal Court judge, but was continued when the Commonwealth of Pennsylvania and the State of New Jersey failed to produce documents required under that Act. Thereafter the hearing was rescheduled and then continued on two additional occasions when the state authorities failed to produce the necessary material. Finally, on January 12, 1976, Thomas was discharged from custody by Municipal Court Judge Joseph P. Braig because the state authorities still had not filed the documents required by the Uniform Act.

On February 17, 1976, the Honorable Daniel H. Huyett, III, of this court sentenced petitioner to a three year term of imprisonment on the federal indictment[5] and she was committed to the Federal Reformatory for Women at Alderson, West Virginia. Shortly after Thomas' arrival at Alderson, New Jersey lodged a detainer with the authorities there based on the same charges which had been the subject of the earlier, unsuccessful Uniform Act proceedings. The transmittal letter accompanying the detainer asked whether petitioner would "waive rendition back to the State of New Jersey on Inter-State Agreements of Detainers," advising that if not, New Jersey would extradite. However, when Thomas refused to waive extradition, New Jersey sought temporary custody pursuant to Article IV(a) of the Interstate Agreement.[6] In order to prevent her imminent

1. 18 U.S.C. § 3182.

2. 18 U.S.C. App. p. 207 (1976 Supp.).

3. Presumably, Thomas was released on bail on the federal charges.

4. The Uniform Extradition Act, which has been adopted by 47 states is not to be confused with the Federal Extradition Act, 18 U.S.C. § 3182, which is at issue here. Hereinafter the Uniform Extradition Act will be referred to as the "Uniform Act" and the Federal Extradition Act simply as the "Extradition Act."

 The need for state legislation such as the Uniform Act results from the fact that while the federal statute imposes a minimum standard for extradition, it does not create machinery to deal with all the exigencies which arise in this area. The Uniform Act fills this void by providing such machinery to the states on a uniform basis. Among the matters covered by the Uniform Act are the method of applying for state habeas corpus relief, the method of arrest and detention of a fugitive before extradition is demanded, the method of applying for a requisition and the extent of asylum allowed a prisoner when brought back to the demanding state. The Uniform Act also expands on the federal statute by providing for the extradition of persons who might not technically be classified as "fugitives" either because they were never physically present in the demanding state or because they left the demanding state under legal compulsion. See Commissioner's Prefatory Note to Uniform Criminal Extradition Act, 11 U.L.A. Crim.L. & Proc. at 53–54 (Master ed. 1974).

5. The record in this case does not reveal whether Thomas' conviction resulted from a court or jury trial or a plea of guilty.

6. The purpose of the Interstate Agreement, which has been enacted by the United States and 38 states, is to provide for the orderly transfer of prisoners from one jurisdiction to another to dispose expeditiously of outstanding detainers that might otherwise interfere with rehabilitative efforts. See Article I of the Interstate Agreement. The Interstate Agreement's major innovation was to give a prisoner the right to demand the speedy disposition of detainers. Cf. *Smith v. Hooey*, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969). The Interstate Agreement also contains a provision for state-initiated prisoner transfers to dispose of outstanding detainers (Article IV). As between the states, this latter provision is of less signifi-

transfer to New Jersey, plaintiff sought and obtained a restraining order from the Honorable John B. Hannum of this court. That suit was later dismissed without prejudice pursuant to a stipulation under the terms of which petitioner was to be afforded a hearing before the Regional Director of the Bureau of Prisons to contest the legality of her delivery to New Jersey authorities.

The evidence presented at the hearing consisted of a copy of the New Jersey indictment together with a request for temporary custody properly approved as required by Article IV(a) of the Interstate Agreement, plus virtually uncontradicted testimony establishing that petitioner was in fact the person named in the indictment.[7] Thomas offered no evidence, but relied on the legal argument that the absence of a warrant issued by the Governor of New Jersey precluded her transfer to that state.[8]

Following the hearing, the Regional Director of the Bureau of Prisons issued a decision granting New Jersey's request for temporary custody pursuant to the Interstate Agreement. In response to the contention of counsel, the Regional Director concluded that "the absence of a 'governor's warrant' does not appear to preclude delivery of William Louise Thomas to the State of New Jersey under the Interstate Agreement on Detainers."[9] Not satisfied with the Regional Director's decision, Thomas instituted the present habeas corpus action.

Petitioner contends that the absence of a governor's warrant from New Jersey would allow her to resist extradition successfully under the Extradition Act, and therefore that she may not be turned over to that state pursuant to the Interstate Agreement unless a governor's warrant is first obtained. In other words, it is petitioner's position that all the rights and defenses to extradition existing under the Extradition Act are to be incorporated into the Interstate Agreement. Petitioner draws support for this proposition from several sources. First, she argues that the Interstate Agreement was designed to expand, not contract, the rights of prisoners subject to detainers, see *United States ex rel. Esola v. Groomes*, 520 F.2d 830 (3d Cir. 1975), and asserts that construing the Interstate Agreement so as to dispense with rights existing under the Extradition Act would be inconsistent with this objective. Although the Interstate Agreement does not designate what, if any, substantive grounds may be used to contest

cance, since the Uniform Act allowed such transfers at the discretion of the sending state's governor and the Interstate Agreement seems to preserve this discretion by authorizing the governor of the sending state to disapprove the request for temporary custody. Compare 19 P.S. § 191.19 and *Com. ex rel. Accobacco v. Burke*, 162 Pa.Super. 592, 597, 60 A.2d 426 (1948) with Article IV(a) of the Interstate Agreement.

7. Thomas' counsel made some minor effort through cross examination to contradict the testimony that Thomas had actually been in New Jersey during the period charged in the indictment, apparently on the theory that under the Extradition Act she could not be extradited unless she was physically present in New Jersey during the time in question. See *Hyatt v. New York*, 188 U.S. 691, 23 S.Ct. 456, 47 L.Ed. 657 (1903). In view of the fact that a prima facie showing was made that petitioner was present in New Jersey during the relevant period, I need not decide whether this limitation would be applicable to transfers under the Interstate Agreement. But see *People of State of New York v. O'Neill*, 359 U.S. 1, 79 S.Ct. 564, 3

L.Ed.2d 585 (1959); *United States ex rel. Grano v. Anderson*, 446 F.2d 272, 278 (3d Cir. 1971) (Van Dusen, J., dissenting); *Huddleston v. Costa*, 314 F.Supp. 278, 280–81 (W.D.Pa.1970); *Cooper v. McDermott*, 399 Pa. 160, 159 A.2d 486 (1960).

8. At the hearing and in his brief to this court, petitioner's counsel also asserted that New Jersey was precluded from obtaining custody of Thomas by reason of its failure to produce the necessary documents in the Uniform Act proceedings before Judge Braig. However, at oral argument in this case, counsel conceded that Judge Braig's discharge of petitioner would not prevent New Jersey from reinstituting extradition proceedings against her. See *Bassing v. Cady*, 208 U.S. 386, 28 S.Ct. 392, 52 L.Ed. 540 (1908); *Commonwealth ex rel. Douglass v. Aytch*, 225 Pa.Super. 195, 310 A.2d 313 (1973); Note, *Extradition Habeas Corpus*, 74 Yale L.J. 78, 131 (1964).

9. Notice of Decision, In Re William Louise Thomas, Production Under the Interstate Agreement on Detainers, September 7, 1976.

a prisoner's delivery [10] nor the procedure to be followed in making such a challenge, Thomas points to Article IV(d) which provides:

> Nothing contained in this article shall be construed to deprive any prisoner of any right which he may have to contest the legality of his delivery as provided in paragraph (a) hereof . . . [11]

In petitioner's view, this provision indicates that the Interstate Agreement left her rights under the Extradition Act intact. Finally, Thomas supports her position by a comparison of the terms used in Article III of the Interstate Agreement, which governs prisoner-initiated disposition requests, with those used in Article IV, which governs requests initiated by a state. Article III(e) says:

> Any request for final disposition *made by a prisoner* pursuant to paragraph (a) hereof shall also be deemed to be a waiver of extradition with respect to any charge or proceeding contemplated thereby or included therein . . .. (emphasis added).

No similar language is found in Article IV. Petitioner contends the absence of such terms in Article IV shows that where the state is the one initiating the request for custody, it must meet the requirements of the Extradition Act.

■ Putting to one side for the moment the Interstate Agreement, I note that

petitioner is correct in arguing that in an Extradition Act proceeding the absence of a governor's warrant from the demanding state would allow the person sought to block extradition. Section 3182 provides, inter alia, that the demand of a state seeking extradition of a fugitive must be "certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled." And as judicially construed, the Extradition Act allows one held for extradition to seek review by way of a habeas corpus petition, see *Illinois ex rel. McNichols v. Pease*, 207 U.S. 100, 28 S.Ct. 58, 52 L.Ed. 121 (1907), in which one of the questions that may be raised is ". . . that the extradition papers are not in order, or are without proper authentication by the demanding state's executive authority." R. Sokol, *Federal Habeas Corpus* § 4.2C, at 47 (2d ed. 1969), quoting Note, *Extradition, Habeas Corpus,* supra, 74 Yale L.J. at 91; *Appleyard v. Massachusetts,* 203 U.S. 222, 27 S.Ct. 122, 51 L.Ed. 161, 163 (1906); *Roberts v. Reilly,* 116 U.S. 80, 6 S.Ct. 291, 29 L.Ed. 544, 549 (1885); *United States ex rel. Grano v. Anderson,* supra, 446 F.2d at 279 (Van Dusen J., dissenting).[12] But, as will be seen below, the absence of a governor's warrant affords Thomas no basis for relief under the circumstances present here.

Central to Thomas' legal argument in this case is the assumption that in the absence

---

**10.** The Interstate Agreement does state that the failure of the executive authority of the sending state affirmatively to consent to or order the prisoner's delivery is not a basis for challenging the delivery. See note 11 infra.

**11.** This section goes on to state, "but such delivery may not be opposed or denied on the ground that the executive authority of the *sending* State has not affirmatively consented to or ordered such delivery." (Emphasis added.) Thomas also contends that the failure to include the executive authority of the *demanding* state within this provision, supports her position that the lack of a warrant signed by the governor of the demanding state is a basis to resist delivery under the Interstate Agreement.

**12.** The other issues that may be raised in an extradition habeas corpus petition are:

(2) that the charge, whether by indictment, or affidavit, is inadequate to support extradition, or is insubstantial; (3) that the petitioner is not the person named in the extradition papers; (4) that the petitioner is not a fugitive from the demanding state's justice because he was not within the demanding state at the time of the alleged offense.

*Sokol,* supra; *United States ex rel. Tyler v. Henderson,* 453 F.2d 790, 793 (5th Cir. 1971); *United States ex rel. Vitiello v. Flood,* 374 F.2d 554, 556 (2d Cir. 1967); *Smith v. State of Idaho,* 373 F.2d 149, 155 (9th Cir.), cert. denied, 388 U.S. 919, 87 S.Ct. 2139, 18 L.Ed.2d 1364 (1967). See also *United States ex rel. Grano v. Anderson,* supra; *Kirkland v. Preston,* 128 U.S. App.D.C. 148, 385 F.2d 670 (1967).

of the Interstate Agreement, the Extradition Act and the constitutional provision which it implements would govern the transfer of a person from federal to state custody. From this assumption, petitioner then advances the arguments discussed above as reasons why the rights conferred by the Extradition Act have not been overridden by the Interstate Agreement. Unfortunately for the petitioner, the underlying assumption that the Extradition Act is applicable to the transfer of an individual from federal to state custody is faulty.[13]

The Extradition Act was originally passed in 1793 to implement Article IV, Section 2, Clause 2 of the Constitution which in turn applies only to the extradition of fugitives among the several states.[14] Although the Extradition Act[15] extends the right to extradite to territories[16] and the obligation to deliver up fugitives to territories[17] and district,[18] it says nothing about persons subject to the custody of the federal government.

More importantly, an examination of the purpose and nature of the extradition obligation reveals its inapplicability to the transfer of custody from the federal government to a state. In *Appleyard v. Massachusetts*, supra, the Court explained the nature of this obligation in the following terms:

> The constitutional provision relating to fugitives from justice, as the history of its adoption will show, is in the nature of a treaty stipulation entered into for the purpose of securing a prompt and efficient administration of the criminal laws of the several states,—an object of the first concern to the people of the entire country, and which each state is bound, in fidelity to the Constitution, to recognize. A faithful, vigorous enforcement of that stipulation is vital to the harmony and welfare of the states. And while a state should take care, within the limits of the law, that the rights of its people are protected against illegal action, the judicial authorities of the Union should equally *take care that the provisions of the Constitution be not so narrowly interpreted as to enable offenders against the laws of a state to find a permanent asylum in the territory of another state.* (Emphasis added.)

203 U.S. at 227, 27 S.Ct. at 124, 51 L.Ed. at 163; see *Kentucky v. Dennison*, 65 U.S. (24

---

**13.** What little authority there is supports exactly the opposite conclusion. 35 C.J.S. Extradition § 2 at 383 states, "No question of extradition is involved where a prisoner in the custody of the United States government is turned over to a state for prosecution." As authority for this statement C.J.S. cites *Gaines v. State*, 95 Tex.Cr.R. 368, 251 S.W. 245, cert. dismissed, 263 U.S. 728, 44 S.Ct. 132, 68 L.Ed. 528 (1923). In that case the defendant was indicted by the federal government for post office robbery and by the State of Texas for murder committed during the course of the robbery. He was arrested in Indiana and brought back to Texas by federal authorities and was later turned over to Texas authorities. To his claim that "having been brought to Texas to undergo trial for the federal offense, he was not amenable to trial in the state court in the absence of extradition proceedings," the court responded:

> the matter in hand, however, is not one of extradition. The United States government found the appellant, who is charged with an offense against its laws, within its jurisdiction and brought him to Texas for trial. The federal authorities were under no obligation

to surrender him to the state; but, having done so, he is not in a position to complain. 251 S.W. at 247; cf. *United States v. Guy*, 456 F.2d 1157, 1160 (8th Cir. 1972).

**14.** Article IV, Section 2, Clause 2 provides:

> A person charged in any *State* with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another *State*, shall on Demand of the executive Authority of the *State* from which he fled, be delivered up, to be removed to the *State* having Jurisdiction of the Crime. (Emphasis added.)

**15.** Act of February 12, 1793, 1 Stat. 302, as amended, 18 U.S.C. § 3182.

**16.** *New York ex rel. Kopel v. Bingham*, 211 U.S. 468, 29 S.Ct. 190, 53 L.Ed. 286 (1908).

**17.** *Ex parte Reggel*, 114 U.S. 642, 5 S.Ct. 1148, 29 L.Ed. 250 (1885).

**18.** The "word 'District' was inserted . . . to make [the statute] equally applicable to fugitives found in the District of Columbia." Revisor's Notes to 18 U.S.C. § 3182; see *Kirkland v. Preston*, supra 385 F.2d at 673 n. 5.

How.) 66, 16 L.Ed. 717 (1861).[19] And in *Biddinger v. Commissioner of Police*, 245 U.S. 128, 133, 38 S.Ct. 41, 43, 62 L.Ed. 193 (1917), the Court stated that the constitutional and statutory provisions were not to be "construed narrowly and technically . . . as if they were penal laws, but liberally to effect their important purpose," which was

> to eliminate, for this purpose, the boundaries of states, so that each may reach out and bring to speedy trial offenders against its laws from any part of the land.

*Id.* at 132–33, 38 S.Ct. at 42, 62 L.Ed. 193.

■ This historical objective of extradition—to prevent the territorial boundaries of a state's sovereignty from frustrating its efforts to bring to justice those who violate its laws—obviously has no application to the dual or "vertical" territorial sovereignty which characterizes the federal-state relationship. Cf. *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959).

■ Furthermore, to apply the Extradition Act to the federal government would be to impose on it an obligation to deliver up a person within its exclusive jurisdiction on the demand of a state. This is an obligation from which the federal government has long been immune by virtue of the Supremacy Clause. See *Ponzi v. Fessenden*, 258 U.S. 254, 261, 42 S.Ct. 309, 311, 66 L.Ed. 607 (1922); *Tarble's Case*, 80 U.S. (13 Wall.) 397, 20 L.Ed. 597 (1871); *Ableman v. Booth*, 62 U.S. (21 How.) 506, 16 L.Ed. 169 (1858); *United States ex rel. Fort v. Meiszner*, 319 F.Supp. 693, 695 (N.D.Ill. 1970); *Quillar v. United States*, 272 F.Supp. 55, 56 (W.D.Mo.1967). To be sure, the United States may waive its immunity from state process and consent to have prisoners in its custody turned over to a state. *Ponzi v. Fessenden*, supra; *Little v. Swenson*, 282 F.Supp. 333, 336 (W.D.Mo.1968); *Quillar v. United States*, supra.[20] It has in fact expressly done so by adopting the Interstate Agreement. *Esola*, supra, 520 F.2d at 835 and n. 17. But in the absence of an express indication that Congress intended the Extradition Act to operate as such a waiver, it would be inappropriate to apply its terms to the federal government.

■ For these reasons, I conclude that the Extradition Act does not apply to a person in the custody of the federal government. That being the case, the Extradition Act gives petitioner no "right to contest the

19. See also *Johnson v. Buie*, 312 F.Supp. 1349, 1351 (W.D.Mo.1970) (extradition provision of the Constitution is primarily for the protection of states, not protection of fugitives); *United States ex rel. Grano v. Anderson*, 318 F.Supp. 263, 269 (D.Del.1970) aff'd 446 F.2d 272 (3d Cir. 1971) (per curiam) (states may not impose more exacting standards on extradition than the federal statute requires); id. at 278 (Van Dusen, J., dissenting) (purpose of Extradition Act is to assure speedy rendition of fugitives under conditions set forth therein and "neither it nor article four of the Constitution confers any federal right on a fugitive not to be extradited pursuant to a state statute permitting extradition under less exacting conditions than those set forth in federal statute").

20. See also 18 U.S.C. § 4085 which provides: (a) Whenever any federal prisoner has been indicted, informed against, or convicted of a felony in a court of record of any State or the District of Columbia, the Attorney General shall, *if he finds it in the public interest to do so*, upon the request of the Governor or the executive authority thereof, and upon the presentation of a certified copy of such indictment, information or judgment of conviction, cause such person, prior to his release, to be transferred to a penal or correctional institution within such State or District.

If more than one such request is presented in respect to any prisoner, the Attorney General shall determine which request should receive preference.

The expense of personnel and transportation incurred shall be chargeable to the appropriation for the "Support of United States prisoners."

(b) This section shall not limit the *authority* of the Attorney General to transfer prisoners pursuant to other provisions of law. June 25, 1948, c. 645, 62 Stat. 850. (Emphasis added.)

If 18 U.S.C. § 3182 were applicable to a person in federal custody there would have been little need for a statute allowing the Attorney General *at his discretion* to turn over federal prisoners to state authorities.

legality of his delivery" to the State of New Jersey which could be preserved by Article IV(d) of the Interstate Agreement. Whether or not, wholly apart from the Extradition Act, a federal prisoner might have some due process right to a hearing prior to transfer to state authorities under the Interstate Agreement and, if so, the grounds upon which he might contest the transfer are questions that are not presently before me. Whatever requirements the due process clause might impose on such transfers, they were satisfied in this case by the hearing afforded petitioner before the Regional Director of the Bureau of Prisons at which it was clearly established that the requirements of the Interstate Agreement had been satisfied, that an indictment had been returned in New Jersey and that, petitioner was the individual named in the indictment. Petitioner was represented by counsel at the hearing, was confronted with and given the opportunity to cross examine the witnesses against her, and was afforded a detailed statement of the Regional Director's findings and conclusions. The due process clause surely entitled her to nothing more. Cf. *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).[21]

---

**21.** It should be noted that a number of cases have held that a prisoner has no right to object to his transfer from federal to state custody to face outstanding state charges, *Ponzi v. Fessenden,* supra; *Konigsberg v. Ciccone,* 285 F.Supp. 585, 601–02 (W.D.Mo.1968), aff'd, 417 F.2d 161 (8th Cir. 1969) cert. denied, 397 U.S. 963, 90 S.Ct. 996, 25 L.Ed.2d 255 (1970); *Little v. Swenson,* supra, 282 F.Supp. at 336–37; *Troyan v. United States,* 240 F.Supp. 383, 384 (D.Kan.1964), but these cases were decided before the expansion of prisoners due process rights hailed by *Morrissey* and its progeny.