592 F.2d 720
 John ADAMS, and all others similarly situated, Appellants,
v.
Julius T. CUYLER, Superintendent, State Correctional
Institution, Graterford, Pennsylvania, Thomas J. Shusted,
Prosecutor, Camden County, New Jersey, Brendan D. Byrne,
Governor of New Jersey, Milton Shapp, Governor of
Pennsylvania, John Doe, and Richard Roe, Detectives, Camden
County, New Jersey, Appellees.
 No. 78-1021.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 14, 1978.
Decided Feb. 9, 1979.
 
 James D. Crawford, James A. Shellenberger, M. Eileen Marquette, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellants.
 Jerry I. Drew, Asst. Atty. Gen., Wynnewood, Pa., Maria Parisi Vickers, Asst. Atty. Gen., Michael von Moschzisker, Deputy Atty. Gen., Eastern Regional Director, Gerald Gornish, Atty. Gen., Philadelphia, Pa., for appellees.
 Before SEITZ, Chief Judge and GIBBONS and WEIS, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 This class action challenges the constitutionality of the Interstate Agreement on Detainers, Pa. Stat. Ann. tit. 19, §§ 1431-1438 (Purdon 1964) (Agreement), and is brought by plaintiff Adams, an inmate of the State Correctional Institution at Graterford, Pennsylvania. After careful review, we find it unnecessary to decide the constitutional issues, but conclude on statutory grounds that procedural safeguards provided in the Uniform Criminal Extradition Act, Pa. Stat. Ann. tit. 19, §§ 191.1-.31 (Purdon 1964 & Supp. 1978) (Extradition Act), also apply to prisoners subject to Article IV of the Detainer Agreement. We therefore will vacate the judgment of the district court dismissing plaintiff's complaint.
 
 
 2
 In May, 1977, New Jersey sent a request for temporary custody under the Agreement to the appropriate Pennsylvania authorities so that Adams could be brought to Camden, New Jersey for trial on charges of armed robbery and other offenses. He challenged the transfer in the district court under the Civil Rights Acts, 42 U.S.C. §§ 1981, 1983, seeking injunctive and declaratory relief, as well as damages. The pro se complaint alleged that plaintiff was not in New Jersey when the crime occurred and that an alibi witness had died in the interval created by the prosecutor's delay in lodging the detainer. Plaintiff contends that had he been given the procedural rights of the Extradition Act, the Pennsylvania courts would not have permitted his transfer. The district judge dismissed the complaint for failure to state a claim. Adams v. Cuyler, 441 F.Supp. 556 (E.D.Pa.1977).
 
 
 3
 Adams received a copy of the request for temporary custody delineating the nature of the indictment lodged against him, but this notice did not contain a copy of the Agreement. Plaintiff contends that the failure to advise him of his right under Article IV of the Agreement to petition the governor for review of the custody request, as well as the absence of any pretransfer hearing provisions, constitute due process violations. He asserts, also, that the refusal of state authorities to apply the hearing requirement of the Extradition Act denies the affected prisoners equal protection under the law.
 
 I.
 
 4
 The Interstate Agreement on Detainers is a compact among 47 states and the United States.[1] United States ex rel. Esola v. Groomes, 520 F.2d 830 (3d Cir. 1975). It was designed to end the many abuses of the detainer system, and to minimize disruption of the rehabilitative process by giving prisoners a means of insuring expeditious disposition of outstanding criminal charges. As discussed in United States v. Mauro, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), the Agreement is an improvement, from both the prisoners' and states' viewpoints, over previous detainer arrangements.
 
 
 5
 Before embarking on an examination of the plaintiff's contention, we must determine if statutory construction will negate the need to confront the constitutional challenges. Hagans v. Lavine, 415 U.S. 528, 543, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). We turn, therefore, to a review of the pertinent parts of the Detainer Agreement.
 
 
 6
 Article III of the Agreement provides that a person serving a term of imprisonment is to be given notice of a detainer lodged against him by the authorities of another state and has the right to demand disposition of the underlying indictment or criminal complaint. If the prisoner requests that the pending case be processed, he is then transferred to the accusing state where trial must be had within 180 days. Article III(a). This article enables the prisoner to compel the prosecuting authorities in the accusing state to dispose of all pending charges. See Article III(d).
 
 
 7
 Article IV is addressed to the prosecution and allows the authorities of the charging state to secure temporary custody of the prisoner so that he may be tried on outstanding indictments or complaints. Section (a) of that Article provides a simplified procedure for arranging transfer of the prisoner. The prosecutor, with the approval of the court that issued the indictments or complaint, serves a written notice upon the authorities of the asylum state. After a 30-day period when the governor of the asylum state may disapprove the request either upon his own motion or that of the prisoner, custody is granted to the accusing state. Article IV contains a speedy trial provision as well, which requires commencement of proceedings within 120 days after arrival in the accusing state. See Article IV(c).
 
 
 8
 Before adoption of the Agreement, the only method available to prosecutors to obtain custody of a person in another state was the extradition process. The procedure under the Extradition Act is more elaborate than that spelled out in the Interstate Detainer Agreement. In an extradition proceeding, the governor of the demanding state asks the governor of the asylum state to deliver the accused. The accused is then entitled to a hearing with the aid of counsel[2] before a judge of a court of record. There it must be shown that: the subject has been charged with the crime in the demanding state; the subject is a fugitive from that state; the subject was present in the demanding state at the time the crime was committed; the required papers are in order and the subject is in fact the person being charged. Commonwealth ex rel. Marshall v. Gedney, 478 Pa. 299, 306, 386 A.2d 942, 945 (1978).
 
 
 9
 The petitioner here asserts that there has been a denial of equal protection because these procedural measures were not available to him before his transfer under the Detainer Agreement. He contends that since prisoners requested by a state not a party to the Agreement receive these statutory benefits, the Equal Protection Guarantee of the United States Constitution is offended. This argument has been accepted by some state appellate courts, See Moen v. Wilson, 536 P.2d 1129 (Colo.1975); State ex rel. Garner v. Gray, 55 Wis.2d 574, 201 N.W.2d 163 (1972), and rejected by others, Wertheimer v. State, 294 Minn. 293, 201 N.W.2d 383 (1972); State v. Thompson, 133 N.J.Super. 180, 336 A.2d 11 (1975); Commonwealth ex rel. Coleman v. Cuyler, --- Pa.Super. ---, 396 A.2d 394 (1978). Our reading of the Agreement obviates the need to answer Adams' contention.
 
 
 10
 In granting the prisoner the right to demand disposition of outstanding charges, Article III imposes a significant limitation in section (e):
 
 
 11
 "Any request for final disposition made by a prisoner pursuant to paragraph (a) hereof shall also be deemed to be a waiver of extradition with respect to any charge or proceeding contemplated thereby or included therein . . . and a waiver of extradition to the receiving state to serve any sentence there imposed upon him, after completion of his term of imprisonment in the sending state. The request for final disposition shall also constitute a consent by the prisoner to the production of his body in any court where his presence may be required in order to effectuate the purposes of this agreement and a further consent voluntarily to be returned to the original place of imprisonment . . . ."
 
 
 12
 The Extradition Act remained in effect after adoption of the Agreement, but when a prisoner chooses to claim the benefits of Article III, he must give up the procedural safeguards of the Extradition Act.
 
 
 13
 Article IV of the Agreement, which confers power on the out-of-state prosecutor to secure custody of an accused prisoner, contains no explicit provision with respect to extradition. There is, however, an oblique but pregnant reference in section (d) which reads:"Nothing contained in this article shall be construed to deprive any prisoner of any right which he may have to contest the legality of his delivery as provided in paragraph (a) hereof, but such delivery may not be opposed or denied on the ground that the executive authority of the sending state has not affirmatively consented to or ordered such delivery."
 
 
 14
 We construe section (d) as reserving to the prisoner the rights granted to him under the existing Extradition Acts, absent, of course, the specified exception. Our interpretation is consistent with that of the Council of State Governments, which approved the text of the Detainer Agreement at its 1956 conference. In its comments on the draft, the Council stated:
 
 
 15
 "Article IV(d) safeguards certain of the prisoner's rights. Normally, the only way to get a prisoner from one jurisdiction to another for purposes of trial on an indictment, information or complaint is through resort to extradition or waiver thereof. If the prisoner waives, there is no problem. However, if he does not waive extradition, it is not appropriate to attempt to force him to give up the safeguards of the extradition process, even if this could be done constitutionally. Nevertheless, the right to insist on action by the governor is a right of the state and not of the prisoner. Consequently, it is provided that the prisoner shall not be able to plead gubernatorial inactivity in resisting delivery to the other state. The situation contemplated by this portion of the agreement is different than that dealt with in Article III. That article relates to proceedings initiated at the request of the prisoner. Accordingly, in such instances it is fitting that the prisoner be required to waive extradition. In Article IV the prosecutor initiates the proceeding. Consequently, it probably would be improper to require the prisoner to waive those features of the extradition process which are designed for the protection of his rights."
 
 
 16
 Council of State Governments, Suggested State Legislation, Program for 1957, at 78-79 (1956). See also Meyer, Effective Utilization of Criminal Detainer Procedures, 61 Iowa L.Rev. 659 (1975).
 
 
 17
 The Council's comments are consistent with the extradition waiver requirements of Article III and explain the savings proviso of Article IV(d). Nowhere in the Agreement is there any indication that the procedural protections of the Extradition Act are abrogated by Article IV and there is no inconsistency between the two enactments, other than the requirement of affirmative action by the asylum governor. Moreover, the fact that Article IV(d) does specifically refer to one minor procedural feature of the extradition process which is to be affected suggests forcefully that the other aspects, particularly those furnishing safeguards to the prisoner, are to continue in effect.[3]
 
 
 18
 We need not and do not decide whether the Detainer Act could constitutionally eliminate prisoners' rights under the Extradition Act. It is enough that the Agreement does not purport to do so. In a situation of this nature where a statute confers certain procedural rights, the enactment of legislation at a later date does not act as a repeal by implication in the absence of substantial inconsistency between the statutes or evidence of an intention to limit or abolish the rights. To hold otherwise would render Article IV(d) meaningless, in derogation of our duty "to give effect, if possible, to every clause and word of a statute." Montclair v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 395, 27 L.Ed. 431 (1882).
 
 
 19
 Our determination is not at odds with this court's opinion in United States ex rel. Esola v. Groomes, supra. In Esola, we held that the Agreement was the sole means of effecting a transfer for purposes of trial between party states. Although that case was concerned with the transfer of a federal prisoner to a state jurisdiction, the holding is not altered when two states are involved. We continue to accept the Esola ruling as a necessary one for if the state authorities were to have the option of utilizing either the Extradition Act or the Detainer Agreement, the speedy trial provisions of the Agreement and its protection against the abuses of the detainer procedure could be thwarted.
 
 
 20
 Incorporating the prisoner's procedural rights under the Extradition Act is not inconsistent with Esola either philosophically or by its terms. The Agreement still forms the basis for the demand of the accusing state. The only substantial variation is that in carrying out the delivery of the prisoner, the hearing and notification rights of the extradition process will be implemented. To this extent, the two enactments are complementary rather than conflicting.
 
 II.
 
 21
 After argument in this case, the Pennsylvania Superior Court filed its opinion in Commonwealth ex rel. Coleman v. Cuyler, supra, in which it rejected constitutional challenges to the Detainer Act, holding that the prisoner petitioner was not entitled to a hearing or notification of charges.[4] The court did not explore the statutory interpretation issue, but it was not urged by the petitioners, either there or in the case Sub judice. Insofar as the Pennsylvania court discussed constitutional considerations and we rely upon statutory interpretation, the rationales are not per se inconsistent. Since we reach a different conclusion, however, it is necessary to determine whether we are bound by the result reached in Coleman.[5]
 
 
 22
 Although a state's interpretation of its own statute is binding on the federal courts, a different result obtains when the legislation adopts an interstate compact. A compact is an agreement between two or more states and is the subject of a brief and negatively phrased authorization in the Constitution: "No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State, or with a foreign power." Art. I, § 10. In a typical situation, an agreement is reached between two or more states, enacted by their respective legislatures, and sanctioned by Congress, often in broad, general terms. At times compacts receive congressional approval before state adoption. Thus, it may be said that a compact is neither exclusively a state nor federal statute but an amalgam of both in reality, a third category.
 
 
 23
 Over the years, compacts have engendered diverse problems, such as the question of jurisdiction in the district courts, Compare League to Save Lake Tahoe v. Tahoe Regional Planning Agency, 507 F.2d 517 (9th Cir. 1974), Cert. denied, 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654 (1975) (finding federal question jurisdiction) With Delaware River Joint Toll Bridge Commission v. Miller, 147 F.Supp. 270 (E.D.Pa. 1956) (rejecting jurisdiction); certiorari jurisdiction in the Supreme Court, Delaware River Joint Toll Bridge Commission v. Colburn, 310 U.S. 419, 60 S.Ct. 1039, 84 L.Ed. 1287 (1940); and, pertinent here, whether state or federal court interpretation controls, Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959). In Petty, the Court said flatly: "The construction of a compact sanctioned by Congress under Art. I, § 10, cl. 3, of the Constitution presents a federal question." Id. at 278, 79 S.Ct. at 788. There would seem to be little doubt, therefore, that federal interpretation of the Interstate Detainers Agreement must govern. Judge Garth, concurring in United States ex rel. Esola v. Groomes, supra, took that position, and although the majority was content to leave the question for another day, that day has now dawned.
 
 
 24
 The underlying theory of federal predominance in the interpretation of interstate compacts is that they become a "law of the Union" because of congressional sanction. See Pennsylvania v. Wheeling & Belmont Bridge Co., 54 U.S. (13 How.) 518, 566, 14 L.Ed. 249 (1851). Yet this rationale has been strongly criticized. For example, a compact may treat matters not assigned to Congress by the Constitution and a new and questionable area may be opened to federal oversight. In some instances, moreover, because approval is given before the precise terms of the compact have been determined, Congress never actually passes upon the language of the enactment that is said to be a "law of the Union." See Engdahl, Construction of Federal Compacts: A Questionable Federal Question, 51 Va.L.Rev. 987, 1040-47 (1965).
 
 
 25
 However valid these objections might be, they are not present in this case. Article IV, § 2 of the Constitution places extradition in the federal domain, and Congress has legislated in this area since 1793, when it passed the first Federal Extradition Act, Act of February 12, 1793, ch. VII, 1 Stat. 302 (1793) (current version at 18 U.S.C. § 3182). And although it is true that the compact was sanctioned in advance in only general terms, the Detainer Agreement was later adopted by Congress, Ipsissimis verbis, when it made the United States a party.[6] There is thus a strong federal interest here to provide a uniform interpretation of a cooperative federal-state venture.
 
 
 26
 Accordingly, we express no opinion on the constitutional reasoning advanced in Coleman, since it is not binding upon us. Our analysis of the statute persuades us that prisoners may be transferred under Article IV of the Agreement only after being given the opportunity for a hearing provided in the Extradition Act, Pa. Stat. Ann. tit. 19, 191.10 (Purdon 1964). Therefore, the judgment of the district court will be vacated and the case will be remanded for further proceedings consistent with this opinion, including consideration of the propriety of declaratory relief applicable to members of the class.
 
 
 
 [1]
 Article I, § 10 of the Constitution commands that all interstate agreements or compacts have the approval of Congress. Authorization for the Interstate Agreement on Detainers may be found in 4 U.S.C. § 112(a), which provides:
 "The consent of Congress is hereby given to any two or more States to enter into agreements or compacts for cooperative effort and mutual assistance in the prevention of crime and in the enforcement of their respective criminal laws and policies, and to establish such agencies, joint or otherwise, as they may deem desirable for making effective such agreements and compacts."
 In 1970, the United States Government, on behalf of itself and the District of Columbia, joined the compact. Pub.L.No. 91-538, §§ 1-8, 84 Stat. 1397 (1970).
 
 
 [2]
 We have no occasion at this time to reconsider our earlier ruling that the state is not required to furnish counsel to indigent prisoners at extradition proceedings. See United States ex rel. Huntt v. Russell, 285 F.Supp. 765, 767 (E.D.Pa.1968), Aff'd per curiam, 406 F.2d 774 (3d Cir. 1969)
 
 
 [3]
 Our research has uncovered only one federal case mentioning Article IV(d). In Thomas v. Levi, 422 F.Supp. 1027 (E.D.Pa.1976), a federal prisoner against whom a detainer had been lodged asserted that Article IV(d) preserved her right under the Federal Extradition Act to require that a warrant be issued by the governor of the demanding state as a precondition to extradition. But because the court held that the federal act does not apply to prisoners transferred from federal to state custody, it had no reason to reach the Article IV(d) issue
 
 
 [4]
 We find it difficult to understand why the Pennsylvania Attorney General's office did not advise us in either brief or oral argument of the pendency of the Coleman case
 
 
 [5]
 We are aware that the Supreme Court of Pennsylvania has not yet passed on the question, but we do have a pronouncement of an intermediate appellate court which we may assume represents state law on the issue. Federal courts are not bound to, but may consider the pronouncements of state intermediate appellate courts as an indication of how the state's highest court would rule. See Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). Cf. National Surety v. Midland Bank, 551 F.2d 21, 29-31 (3d Cir. 1977). See generally C. Wright, Law of Federal Courts § 58 (3d ed. 1976)
 
 
 [6]
 We are not here confronted with the issue whether jurisdiction under the federal question statute, 28 U.S.C. § 1331 is present. Plaintiff asked for a declaratory judgment and declaratory relief under §§ 1981 and 1983, jurisdiction being asserted under 28 U.S.C. § 1343